IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

LISA CRAIN; CATHEE CRAIN;
MARILLYN CRAIN BRODY; and
KRISTAN SNELL                                                                                    PLAINTIFFS

V.                                    CASE NO. 2:20-CV-2038

SHIRLEY CRAIN; BRIAN POPE;
and RAY FULMER,
as Representative of the Estate
of H.C. "Dude" Crain, Jr., Deceased                                                  DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Before the Court are a Motion for Summary Judgment (Doc. 89) filed by Separate Defendant Shirley Crain ("Shirley") and a Motion for Partial Summary Judgment filed by Plaintiffs Cathee Crain, Lisa Crain, Marillyn Crain Brody, and Kristan Snell (Doc. 101).[1] For the following reasons, Shirley's Motion is **DENIED,** and the Plaintiffs' Motion is **GRANTED**.

## I. BACKGROUND

The issues in this case stem from a property settlement agreement (the "PSA") executed by the Plaintiffs' parents, H.C. "Dude" Crain and Marillyn Crain. (Doc. 38-2).

---

[1] The other documents considered by the Court include: Shirley's Memorandum in Support (Doc. 90); Shirley's Statement of Undisputed Material Facts (Doc. 91); Shirley's Supplemental Brief (Doc. 95); Shirley's Supplemental Statement of Facts (Doc. 96); Plaintiffs' Combined Brief in Support of their Motion and in Opposition to Shirley's Motion (Doc. 102); Plaintiffs' Response to Shirley's Statement of Facts (Doc. 103); Shirley's Reply (Doc. 115); Separate Defendant Brian Pope's Response in Opposition to Plaintiffs' Motion (Doc. 118); Mr. Pope's Response to Plaintiffs' Counterstatement of Facts (Doc. 119); Shirley's Response in Opposition to Plaintiffs' Motion (Doc. 121); Shirley's Brief in Opposition to Plaintiffs' Motion (Doc. 122); Shirley's Response to Plaintiffs' Counterstatement of Facts (Doc. 124); Plaintiffs' Reply (Doc. 132); and Shirley's Supplement (Doc. 140). The Court also held a hearing on the motions on May 5, 2021, and entertained oral argument from counsel at that time.

1

Dude and Marillyn were married on May 1, 1954, and they separated in 1976. The Plaintiffs are the only children of the marriage. Dude filed for divorce from Marillyn on September 20, 1988, and on June 22, 1989, they executed the PSA. Dude married Shirley a few months later, on November 1, 1989.

According to the unambiguous language of the PSA,[2] Dude and Marillyn entered into the agreement to "fully and finally settle, resolve and terminate any and all claims, demands and rights of whatever kind or nature between" them. *Id.* at p. 7, ¶ 9. They were represented by separate counsel and gave informed consent to all terms contained in the PSA. *Id.* at p. 8, ¶ 10. Paragraph 1 explains the couple's agreement as to the division of real and personal marital property. Marillyn agreed to receive a house in Fort Smith, Arkansas (subject to any indebtedness), all household furnishings and appliances located in that house, all bank accounts in her name, all separate property she inherited from her mother, a one-time cash payment of $250,000, and an annuity in the amount of $1.5 million, payable to her in monthly installments over fifteen years. All other real, personal, and mixed marital property became Dude's. *Id.* at p. 5, ¶ 1.[3]

As part of the couple's agreement concerning the division of their marital property, they also considered how their children would be impacted financially by their divorce. To

---

[2] The parties agree that the PSA is unambiguous, and the Court concurs.

[3] To put in perspective the comparative value of the marital property that Dude and Marillyn received through the PSA, it is undisputed that the couple owned a lucrative business called Crain Industries during their marriage. Marillyn received zero interest in Crain Industries through the PSA, though that business was reportedly earning annual revenues of $154 million in 1990, the year after the PSA was signed. (Doc. 124, p. 6). According to the Plaintiffs' affidavits, Dude sold Crain Industries for approximately $130 million in 1995. (Doc. 104-5 to 104-8). Defendants dispute the alleged sales price. (Doc. 125, p. 7).

that end, Dude and Marillyn made mutual promises to engage in estate planning to "maintain" a will leaving at least half of their respective estates to their daughters. PSA Paragraph 3, which the Court will refer to as the "will provision," states:

> In further consideration of the covenants and agreements contained herein, husband and wife agree to maintain in full force and affect [sic] a valid Last Will and Testament whereby each will leave at least one-half of their estate to the four daughters of this marriage, Lisa . . .; Cathee . . .; Marillyn . . .; and Kristan . . ., per stirpes."

*Id.* at p. 6. The Chancery Court of Logan County, Arkansas, stated in a written order dated June 22, 1989, that it had "examined the Property Settlement Agreement between the parties" and found "that said agreement is contractual and nonmodifiable." *Id.* at p. 2, ¶ 5.

Marillyn died in 2006. The Plaintiffs were the only heirs of her estate, which was valued at the time of her death at approximately $1.5 million. In accordance with her will (Doc. 91-4), all the assets Marillyn owned, with the exception of some designated personal items, were divided equally among her four daughters, *per stirpes*. *Id.* at § 4.2. Each daughter's share was divided between two trusts: one containing assets not subject to estate tax (i.e., assets valued up to the amount of the lifetime gift and estate tax exemption), and the other containing assets subject to taxation. Each daughter was named the sole, direct beneficiary and sole trustee of her two trusts. The will also empowered each daughter to immediately distribute to herself "so much of the income and principal of the property [in her trusts] required to provide for [her] maintenance, health, education and support in reasonable comfort." *Id.* at § 5.4.

Dude, on the other hand, wrote a will in 1993 that left nothing to his daughters and everything to his second wife, Shirley. *See* Doc. 104-1. Nearly two decades later, he

3

engaged an attorney to draw up a new will.  This document, which was signed on April 30, 2012, (Doc. 38-3, pp. 5–28), purported to leave all of Dude's ownership interest in his household furnishings, automobiles, and personal effects to Shirley and divided his residual estate among two trusts:  the Bypass Trust and the Marital Deduction Trust.[4] The Bypass Trust was to include only those assets that could pass free of estate taxes (i.e., an amount equal to Dude's gift and estate tax exemption) "after taking into account all other lifetime and testamentary dispositions by [Dude] and the actions of [his] executor in making certain tax elections."  *Id.* at § 2.2.A(a). The direct beneficiaries of the Bypass Trust were the four Plaintiffs and Separate Defendant Brian Pope, Shirley's son from a previous marriage. Under the 2012 will, they were each entitled to receive an equal share of the assets in the Bypass Trust, *id.* at § 2.4, and Shirley was to serve as the trustee.  *Id.* at § 1.3.  The rest of Dude's estate was to fund the Marital Deduction Trust.  Dude specified that this trust would be "for the exclusive benefit of [his] wife," Shirley. *Id.* at § 2.3.B.  Shirley was to be the direct beneficiary and the sole trustee of the Marital Deduction Trust.  Once that trust was funded, she would have the discretion to pay herself "annually or more frequently all of the net income," *id.* at § 2.3.C, and "so much or all of the principal . . . as [she] may direct from time to time."  *Id.* at § 2.3.D.  Only upon Shirley's death would the Marital Deduction Trust terminate, with any remaining balance divided equally among the Plaintiffs and Mr. Pope as remainder beneficiaries.  *Id.* at § 2.3.E.

---

[4] To be clear, the property mentioned in the will was only a fraction of Dude's assets.  The vast majority of the assets he enjoyed and controlled during the last two decades of his life were jointly owned with Shirley, either in tenancies by the entirety or in joint tenancies with right of survivorship.

Dude's 2012 will did not obligate Shirley to leave the Plaintiffs anything by and through the Marital Deduction Trust.

On May 21, 2012, approximately a month after Dude signed the 2012 will, he executed a codicil to that will. *See* Doc. 38-3, pp. 29–32. The codicil's only function was to further limit the Plaintiffs' (and Mr. Pope's) ability to inherit under the will. Before the codicil was executed, the will had specified that the Plaintiffs and Mr. Pope would inherit under both trusts *per stirpes*, but the codicil modified §§ 2.3E and 2.4 of the will to eliminate *per stirpes* inheritance. *See* Doc. 38-3, pp. 29–30.

At the end of 2012, Dude and Shirley gave the Plaintiffs and Mr. Pope Christmas gifts of $1.648 million each. (Doc. 91, p. 3). Dude and Shirley represented to the Plaintiffs in writing that half of each gift satisfied Dude's lifetime gift and estate tax exemption with respect to each Plaintiff. Shirley contends that when Dude died on April 15, 2017, "all or almost all amounts that could have gone into the Bypass Trust to the Plaintiffs and Pope" were depleted by the December 2012 gifts. *Id.* During a hearing on the summary judgment motions on May 5, 2021, Shirley's counsel clarified that if the 2012 will were probated, there would be no assets available to pass into the Bypass Trust by virtue of Dude's "pre-death bequest" to his daughters (and Mr. Pope) during Christmas of 2012. The Plaintiffs dispute that the Christmas gifts should be credited toward the amount they contend they are owed under the PSA.

Shirley never initiated a probate action after Dude died. Instead, nearly three years later, on March 19, 2020, the Plaintiffs filed a petition to open a probate proceeding in the Circuit Court of Sebastian County, Arkansas, and that court appointed Separate Defendant Ray Fulmer to serve as executor of Dude's estate. Shirley initially represented

5

to the probate court that Dude's operable will was the one he executed in 1993, but she later corrected this error and disclosed the superseding will and codicil executed in 2012. It appears the Plaintiffs were aware at the time they filed the probate action that Dude had made an agreement with their mother to leave them one-half of his estate, and they initiated the probate action in the hope of receiving their inheritance. On March 27, 2020, they filed the instant lawsuit, asking this Court to find that Dude breached the PSA and requesting that a constructive trust be impressed on one-half of Dude's property that should have passed through his will.

     Shirley believes that the 2012 will is valid and that Dude intended to leave at least half his estate to the Plaintiffs through that instrument. First, Shirley contends that Dude made pre-death bequests to the Plaintiffs in December of 2012 which collectively would have funded 80% of the Bypass Trust. Second, she argues that the will entitles the Plaintiffs to collectively inherit 80% of the assets that would fund the Marital Deduction Trust—once Shirley dies. In her view, the money the Plaintiffs would receive through the 2012 will would equal at least one-half of Dude's estate—if "estate" were defined as Dude's *probate* estate, i.e., the property he separately owned at the time of his death.

     The Plaintiffs respond to these arguments with two of their own. First, they assert that Dude breached the PSA because the 2012 will does not purport to leave them at least half of his estate—even if "estate" were limited to Dude's probate estate. Further, if the Court were to assume that the 2012 Christmas gifts should be credited toward the Plaintiffs' inheritance, they point out that those gifts, collectively, do not equate to half of

Dude's probate estate.[5]  The Plaintiffs also maintain that any interest they might have in the Marital Deduction Trust as remainder beneficiaries is illusory, as Shirley is the sole trustee and sole direct beneficiary of that trust and is empowered to deplete as much of the principal as she likes during her lifetime.[6]

Second, the Plaintiffs argue that Dude failed to engage in estate planning that would result in them receiving at least half of his estate, in violation of the PSA.  In the Plaintiffs' view, Dude breached the promise he made to their mother by shielding from probate the lion's share of the assets he enjoyed and controlled during his lifetime—which the parties confirmed during the hearing are valued at approximately $100 million today.  He owned those assets in either tenancies by the entirety or joint tenancies with right of survivorship with his wife, Shirley.  This meant that the assets were his to control until the moment of his death, but at death they passed outside of probate to Shirley by operation of law.[7]  The Plaintiffs believe the purpose of the will provision of the PSA will be entirely frustrated if Dude's estate is defined to exclude the property he owned jointly with Shirley.  They therefore ask the Court to find that Dude breached the PSA and to impress a

---

[5]  The Plaintiffs' expert has valued the Marital Deduction Trust's assets at approximately $12 million.  Shirley disagrees with that valuation.  Her counsel was asked during the hearing to estimate the value of the assets, and he asserted that they were worth closer to $10 million.

[6] Shirley disagrees with that characterization.  At the motion hearing, her counsel described the Plaintiffs' likelihood of inheriting under the Marital Deduction Trust as "speculative," but not illusory.

[7] To illustrate the point, the Plaintiffs refer to an investment account that Dude owned jointly with Shirley during his lifetime and which is now valued at around $95 million. When Dude was alive, the contingent beneficiaries of that account were the Plaintiffs and Mr. Pope, in equal shares.  (Doc. 104-14, p. 1). When Dude died, Shirley became the sole owner of the account by operation of law, and she removed the Plaintiffs as beneficiaries and left her son as the sole beneficiary.  *Id.* at p. 3.

7

constructive trust over half the assets he owned or controlled up until the moment of his death, regardless of how that property passed by operation of law after his death.

Under Arkansas law, a contract to make a will is enforceable if there is "[a] writing signed by the decedent evidencing the contract." Ark. Code Ann. § 28-24-101(b)(1)(C). In the case at bar, the Court has been presented with such a writing—the PSA—signed by Dude and evidencing an agreement he made with Marillyn to make a will for the benefit of their four daughters. As part of the equitable remedy of divorce, the Chancery Court declared the PSA (including its will provision) to be "contractual and non-modifiable." All parties to the instant dispute agree that the PSA is valid, enforceable, and unambiguous in its terms. The parties also agree that the Court is in possession of all the facts needed to decide whether Dude breached the will provision of the PSA. To make a finding of breach, the Court need only analyze the bequests Dude made to his daughters in his 2012 will and then determine whether those bequests satisfy the plain terms of the PSA.

Though Shirley and Mr. Pope take the position that the 2012 will satisfies the PSA, their argument is untenable on its face, as the discussion below will make clear. Plaintiffs argue that if the Court finds that Dude breached the PSA, the appropriate remedy is specific performance—and the Court agrees. Specific performance of the contract here would involve impressing a constructive trust on Dude's assets. But which assets? The parties vigorously dispute this question, which goes to the nature and scope of the constructive trust. Below, the Court will begin its analysis by considering the legal standard that applies when deciding cross-motions for summary judgment. Next, the Court will examine whether the bequests to the Plaintiffs in Dude's 2012 will are sufficient to satisfy the will provision of the PSA. After that, the Court will construe what Dude and

Marillyn intended by the term "estate" in the PSA's will provision. And finally, the Court will analyze the scope of the constructive trust that must be impressed upon Dude's assets.

## II.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When, as here, cross-motions for summary judgment are filed, each motion should be reviewed in its own right, with each side "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983). The Court must view the facts in the light most favorable to the non-moving party and give the non-moving party the benefit of any logical inference that can be drawn from the facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997). The moving party bears the burden of proving the absence of any material factual disputes. Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

If the moving party meets this burden, then the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting then-Fed. R. Civ. P. 56(e)) (emphasis removed). These facts must be "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### III.  DISCUSSION

### A.  2012 Will and Codicil

Shirley contends that Dude satisfied his promise under the PSA to "leave at least one-half of [his] estate to the four daughters . . . per stirpes" when he executed his 2012 will and codicil.  (Doc. 38-2, p. 6, ¶ 3).  The Court disagrees.  The PSA explicitly requires that Plaintiffs inherit *per stirpes*, but the codicil to the will eliminates the possibility of *per stirpes* inheritance—a fact Shirley's counsel admitted during the summary judgment hearing.  Counsel suggested that this particular breach of the PSA's requirements could be corrected by rescinding the codicil; but the Court believes doing this will not be enough to cure the breach.  The 2012 will does not provide a mechanism by which Plaintiffs will inherit at least one-half of Dude's estate, and this is true even if "estate" is defined to mean only the property Dude separately owned upon his death and contemplated passing to his heirs through probate.

The will envisions the property that Dude separately owned at death being deposited into the Bypass Trust and/or the Marital Deduction Trust.  The parties agree that if the will were to be probated today, no assets would flow to the Bypass Trust.  There remains a live dispute about whether Plaintiffs already received part of their inheritance under the will when their father gifted them with cash in December of 2012; however, there is no dispute that this gift totaled somewhere around $3.3 million (collectively).[8]

---

[8] Each Plaintiff received a gift of $1.648 million.  $1.648 million x 4 = $6.592 million. Shirley claims that half of each gift came from her, while the other half came from Dude. Half of $6.592 million is $3.296 million.

10

Shirley does not contend that the 2012 Christmas gift would have been sufficient, on its own, to satisfy Dude's obligations to Plaintiffs under the PSA.[9]

Focusing next on the Marital Deduction Trust, the Court finds that the Plaintiffs would not be direct beneficiaries, and they would not be guaranteed to inherit any amount as remainder beneficiaries under the trust. The sole, direct beneficiary would be Shirley, and she would be empowered to do what she liked with the assets of the trust during her lifetime. In particular, she would be free to spend "so much or all of the principal" as she might direct. (Doc. 38-3, § 2.3D). Since the will would not require that *anything* be left to the Plaintiffs through the Marital Deduction Trust, it is disingenuous for Shirley to suggest that this trust would satisfy the will provision of the PSA.[10]

Because Dude failed to engage in appropriate estate planning that would have left at least half of his estate to the Plaintiffs, he breached the promise he made to Marillyn as memorialized in the PSA. The breach here is obvious; it is not a close call. The remedy is specific performance of the PSA's will provision. *See Janes v. Rogers*, 271 S.W.2d 930, 934 (Ark. 1954) (finding that the appropriate remedy for breach of contract to make a will is specific performance). In considering how best to achieve specific

---

[9] Indeed, Shirley believes the assets that would flow to the Marital Deduction Trust would be valued at around $10 million, while the Plaintiffs place that value at over $12 million. Assuming half the value of the Marital Deduction Trust would be between $5 million and $6 million, the Christmas gift of $3.3 million falls short.

[10] It is equally disingenuous for Shirley to argue in her briefing that the trust mechanism set forth in Marillyn's will was identical to that of Dude's will, such that Plaintiffs should be estopped from complaining about the sufficiency of Dude's will since they did not complain about Marillyn's. Under Dude's will, Plaintiffs are left with only a remainder interest in a trust controlled exclusively by their stepmother, whereas under Marillyn's will, the Plaintiffs received a direct, beneficial, and immediate interest in all assets their mother owned during her lifetime. Marillyn's will complied with the will provision of the PSA, while Dude's did not.

performance, the Court must next evaluate what Dude and Marillyn intended when they agreed to the will provision of the PSA.

### B. Meaning of the Term "Estate"

Shirley and Mr. Pope would have the Court impress a constructive trust on only Dude's probate estate, which they define as the separate property Dude owned at the time of his death that will pass under the 2012 will through probate. But the Plaintiffs suggest that the scope of the constructive trust and the definition of "estate" in the PSA should be interpreted more broadly. They believe that Dude and Marillyn made a straightforward agreement to leave half of the property they owned and controlled during their lifetimes to their daughters.

The Arkansas Supreme Court has articulated "three well-established principles of contract law" that should be considered as the Court interprets the PSA:

> [T]he first rule of interpretation of a contract is to give to the language employed the meaning which the parties intended. *Lee Wilson & Co. v. Fleming,* 203 Ark. 417, 156 S.W.2d 893 (1941). Second, in construing any contract, "[w]e must consider the sense and meaning of the words used by the parties as they are taken and understood in their plain, ordinary meaning." *Farm Bureau Mut. Ins. Co. of Arkansas, Inc. v. Milburn,* 269 Ark. 384, 386, 601 S.W.2d 841, 842 (1980). Third, "[d]ifferent clauses of a contract must be read together and the contract construed so that all of its parts harmonize, if that is at all possible, and, giving effect to one clause to the exclusion of another on the same subject where the two are reconcilable, is error." *Continental Casualty Co. v. Davidson,* 250 Ark. 35, 41, 463 S.W.2d 652, 655 (1971).

*First Nat'l Bank of Crossett v. Griffin*, 832 S.W.2d 816, 819 (Ark. 1992). Where, as here, a contract's terms are unambiguous, the meaning of the contract is an issue of law. *Surratt v. Surratt*, 148 S.W.3d 761, 768 (Ark. Ct. App. 2004). "The law presumes that the parties understood the import of their contract and that they had the intention which the terms of the contract manifest." *Connelly v. Beauchamp,* 13 S.W.2d 28, 30 (Ark. 1929).

Shirley maintains that Dude had the legal right—or, in other words, *the choice*—to hold his property in whatever way he liked during his lifetime, and she contends that his choice should be honored even after his death.  Dude chose to title most of his property jointly with Shirley, so when he died, all of that property passed to Shirley outside of probate.  Then he chose to leave the residue of his estate in two trusts, one that (as it turns out) will not be funded after death and the other to be funded with assets that only Shirley is free to spend at her sole direction.  During the motion hearing, the Court asked Shirley's counsel at what point Dude's contractual obligations to his daughters would overcome his freedom of choice.  The Court first asked whether Dude could have complied with the PSA by leaving zero assets in his probate estate, and counsel readily answered in the negative.  He said, "There must be something in the estate under the Property Settlement Agreement, so a null set would be a violation."  Then the Court asked counsel what "minimum amount" would have been sufficient for Dude to leave in his probate estate and still satisfy his obligations under the PSA.  Counsel responded that he was "not sure" but felt the amount Dude *actually left* was good enough.  In other words, Shirley's position on this issue appears to be that *any amount* Dude chose to set aside for his daughters in a will would have satisfied the PSA.[11]

The colloquy the Court had with Shirley's counsel during the hearing highlights why Shirley's reading of the PSA is wrong.  Plainly, Dude and Marillyn agreed to the will provision of the PSA for a reason:  to create certainty in an uncertain future.  They agreed

---

[11] Counsel for Shirley doubled down on this argument in the final minutes of the hearing, explaining:  "[I]f the decedent has a dollar, and leaves zero in an estate, that's the case that I would say there's been a breach."  By that logic, if Dude had funded his probate estate with a dollar—despite owning more than $100 million on the day he died—he would have satisfied the PSA by leaving the Plaintiffs a collective inheritance of fifty cents.

to leave at least half their estates—not some lesser discretionary amount chosen by each party—to their daughters and not to other heirs. If Dude were permitted to avoid the basic certainty of contracting that the non-modifiable PSA provided, the will provision would be utterly meaningless.

The Court finds that the better interpretation of "estate" in the PSA, especially given the context of its use and purpose within the divorce proceedings, is all the property that Dude and Marillyn owned and controlled prior to their deaths—not merely *any amount* they chose to leave in their respective probate estates. *Cf. Nile v. Nile*, 734 N.E.2d 1153, 1161 (Mass. 2000) ("To say that a person has fulfilled his agreement to give to another all of his property at his death . . . , and then to turn right around and annul and effectually destroy such testamentary provision by conveying away all of his property to another, leaving nothing whatever upon which the will could operate, would be but keeping the word of promise to the ear and breaking it to the hope.") (internal quotation and citation omitted).

Though there is little Arkansas case law involving contracts to make wills, the two cases cited below support the Court's decision to impress a constructive trust over the property Dude enjoyed and controlled just prior to his death, including property that he intended to pass outside of probate directly to a joint owner. The first such illustrative case is *Gregory v. Estate of Gregory*, 866 S.W.2d 379 (Ark. 1993). H.T. and Gladys Gregory, husband and wife, entered into a contract to make reciprocal wills. The contract provided that the couple would not revoke their wills without the consent of all beneficiaries. They then executed wills that that left their estates in trust for the benefit of their six children. When Gladys predeceased H.T., her property passed into the trust.

A few years later, H.T. married Genevive. With his children's explicit consent, H.T. executed a codicil to his will that gave Genevive a life estate in the marital home but specified that it would pass to H.T.'s children upon her death. When H.T. died, Genevive tried to take her dower and homestead interests and statutory allowances against the will—and against the rights of H.T.'s children. The Arkansas Supreme Court recognized that there were "two competing public policies in this case—the right of a couple to contract to make mutual wills that are irrevocable and that dispose of both estates to third-party beneficiaries, and the right of a surviving spouse to take an elective share." *Id.* at 382. The court held that all of H.T.'s property, including personal and residuary property, "was subject to and encumbered by the superior contractual rights of the six children." *Id.* at 383. Relevant to the case at bar was the *Gregory* court's observation that H.T. "was without power to change the Agreement" he had made with Gladys and that "the children had an interest in their parents' property" by virtue of that agreement. *Id.* at 384.

The second case relied on by the Court is *Janes v. Rogers*, 271 S.W.2d 930 (Ark. 1954). There, the Arkansas Supreme Court held that the decedent, Ella Rogers, breached a contract with her husband, J.D., to execute reciprocal wills in favor of their four sons equally. Two of the sons were Ella's by a prior marriage, and the other two sons were J.D.'s by a prior marriage. J.D. died before Ella, and the property the two of them held jointly passed directly to Ella by operation of law, as the property was held in tenancies by the entirety. However, a few years after J.D.'s death, Ella executed a new will that named her sons the sole beneficiaries of all her property. After J.D.'s sons sued to enforce the contract, Ella's sons made the argument that "since the property held by the

15

entirety went to Ella . . . upon her husband's death, he had no interest which could be devised by his will." *Id.* at 933.  The court disagreed, explaining:

> It is true that [Ella] took title to such real estate by operation of law and not by the will but this does not mean that the contract to make the will could not operate upon the real estate so acquired by her . . . . [A] contract between husband and wife like that involved here is applicable to property held by the spouses in an estate by the entirety, even though it would not pass under the will of either spouse but would devolve on the surviving spouse by operation of law.

*Id.*  Ella's sons were directed by the court "to transfer to [J.D.'s sons] their share of the property in accordance with the contract." *Id.* at 934.

It is black letter law that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *W. Memphis Adolescent Residential, LLC v. Compton*, 374 S.W.3d 922, 925 (Ark. Ct. App. 2010) (citing Restatement (Second) of Contracts § 205).  When a person who has entered into a contract to make a will transfers property during his lifetime in a way that leaves little for probate, this "will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Nile*, 734 N.E.2d at 1160 (quotation marks and citation omitted) (interpreting the covenant of good faith and fair dealing in the context of a contract to make a will).  The Court finds that the Plaintiffs are entitled to summary judgment on their breach of contract claim on the issue of liability.  This outcome will allow them to receive the fruits of the contract their parents made.

### C.  Constructive Trust

The final issue for the Court to address is how to achieve specific performance of the PSA's will provision.  "A constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that [she]

16

would be unjustly enriched if [she] were permitted to retain it." *Cox v. Miller*, 210 S.W.3d 842, 848 (Ark. 2005). "The duty to convey the property may arise because it was acquired through . . . wrongful disposition of another's property." *Id.* at 849. A constructive trust has the effect of converting the person with the duty to convey "'into a trustee for the parties who in equity are entitled to the beneficial enjoyment.'" *Davidson v. Sanders*, 357 S.W.2d 510, 517 (Ark. 1962) (quoting Black's Law Dictionary, 4th Edition). Therefore, the Court will impress a constructive trust on half the property Dude owned and controlled up to the moment of his death, (as well as any post-death interest, earnings, or proceeds), with the value of such to be determined at trial.

## IV. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the Motion for Summary Judgment (Doc. 89) filed by Separate Defendant Shirley Crain is **DENIED**, and the Motion for Partial Summary Judgment filed by Plaintiffs Cathee Crain, Lisa Crain, Marillyn Crain Brody, and Kristan Snell (Doc. 101) is **GRANTED**. The Plaintiffs are entitled to specific performance of the PSA, and the Court will impress a constructive trust on half the property that H.C. "Dude" Crain owned and controlled up to the moment of his death.

**IT IS SO ORDERED** this 24th day of May, 2021.

/s/ Timothy L. Brooks
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE