**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FORT SMITH DIVISION**

**LISA CRAIN; CATHEE CRAIN;**
**MARILLYN CRAIN BRODY; and**
**KRISTAN SNELL**                                                          **PLAINTIFFS**

**V.**                                    **CASE NO. 2:20-CV-2038**

**SHIRLEY CRAIN and RAY FULMER,**
**as Representative of the Estate**
**of H.C. "Dude" Crain, Jr., Deceased**                           **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

### TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND ............................................................................... 2

III. PROCEDURAL BACKGROUND ....................................................................... 5

IV.  DISCUSSION .................................................................................................... 8

   A. Findings of Fact ............................................................................................ 9

     1. Dude's Separate Assets ........................................................................... 9

     2. Shirley's Separate Assets (Purchased with Marital Funds) ............................. 15

     3. Assets Dude Owned Jointly with Shirley at His Death ..................................... 16

     4. 2012 Christmas Gifts ................................................................................. 32

   B. Conclusions of Law ...................................................................................... 32

     1. General Principles:  Imposition of a Constructive Trust ..................................... 32

     2. Burdens of Proof ........................................................................................ 36

     3. Arkansas Law Regarding Jointly Held Property ............................................... 37

     4. Shirley's Equitable Interest in Jointly Held Property ......................................... 39

     5. Equitable Treatment of Property No Longer in Shirley's Possession ................... 44

     6. Treatment of the 2012 Christmas Gifts ......................................................... 48

   C. Application of Law to Findings of Fact ........................................................... 49

V.   CONCLUSION ................................................................................................ 58

## I.   INTRODUCTION

Following the Court's May 24th ruling on Summary Judgment (Doc. 147), this matter came on for a bench trial from July 19, 2021, to July 21, 2021.  The purpose of the trial was to identify and value the assets that H.C. "Dude" Crain owned and controlled just before his death on April 15, 2017.

Prior to trial, the parties agreed to submit opening briefs in lieu of opening statements.  Several of Plaintiffs' witnesses also appeared on Defendants' witness list; so, for judicial efficiency and to avoid inconveniencing these witnesses by calling them to the stand twice, the Court ordered that all witnesses take the stand only one time and submit to questioning by all parties for all purposes.

Plaintiffs then presented their case-in-chief.  They rested on the third day of trial, and Defendants presented an oral motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which the Court denied from the bench.  At that point, Defendants began their case-in-chief.  They called only one witness, as the rest of their witnesses had already taken the stand during Plaintiffs' case-in-chief.  After Defendants rested, they renewed their motion for judgment as a matter of law, which was once again denied.  The parties then presented closing arguments, and afterward, the Court identified specific legal issues that required further briefing.  The parties were directed to submit post-trial briefs on these selected topics within two weeks of the last day trial.  All parties submitted their post-trial briefs on time, and the Court reviewed those briefs, the transcript of the trial, and the voluminous exhibits that were introduced in evidence.  Below is a brief description of the background of the case followed by the Court's findings of fact, conclusions of law, and rulings.

## II.  FACTUAL BACKGROUND[1]

Dude was eighty-seven years old when he passed away in 2017, leaving behind his second wife, separate Defendant Shirley Crain, and four adult daughters from his first marriage, Plaintiffs Lisa Crain, Cathee Crain, Marillyn ("Mimi") Crain Brody, and Kristan Snell.  Dude married the Plaintiffs' mother, Marillyn, on May 1, 1954.  Around 1960, Dude, Marillyn, and Dude's parents started Crain Sales Company. Initially, Marillyn worked full time for Crain Sales Company as the office manager. Among other things, Marillyn set up the office, answered the phones, accepted orders, checked the freight cars, managed the invoicing, hand crafted patterns for foam cushions, and handled accounts-payable. (Doc. 124, pp. 1–2).  Around 1963, Crain Sales Company was incorporated as Crain Industries, Inc.  Crain Industries grew to be one of the largest companies in Arkansas, manufacturing polyurethane foam and producing foam and polyester fiber products.  (Doc. 165, p. 2).

Dude and Marillyn's marriage did not last.  In 1984, he began dating the woman who would become his second wife, separate Defendant Shirley Crain.  *Id.*  He filed for divorce from Marillyn on September 30, 1988, after thirty-four years of marriage.  *Id.*  On June 22, 1989, the divorce was finalized, and Dude and Marillyn entered into a property settlement agreement ("PSA") (Doc. 38-2).  According to the PSA, Marillyn did not receive any award of stock in Crain Industries.  *See id.*  The parties to the instant case agree that at or around the time of Dude and Marillyn's divorce, Crain Industries was a multi-million-dollar company.  *Arkansas Business Journal* reported that in 1990—the year after the divorce—Crain Industries's annual revenues totaled $154 million.  (Doc. 124, p. 6).

---

[1] The factual background in this Opinion is merely a summary; a more fulsome description of undisputed facts appears in the Court's summary judgment order (Doc. 147, pp. 1–9).

The PSA specified how Dude and Marillyn's real and personal property would be divided upon their divorce and memorialized their agreement to engage in estate planning.  They made mutual promises to "maintain" wills that would leave at least half of their respective estates to their daughters.  PSA Paragraph 3, the will provision, states:

> In further consideration of the covenants and agreements contained herein, husband and wife agree to maintain in full force and affect [sic] a valid Last Will and Testament whereby each will leave at least one-half of their estate to the four daughters of this marriage, Lisa . . .; Cathee . . .; Marillyn . . .; and Kristan . . ., per stirpes.

(Doc. 38-2, p. 6).  The Chancery Court of Logan County, Arkansas, issued a written order stating that it had "examined the Property Settlement Agreement between the parties" and found "that said agreement is contractual and nonmodifiable."  *Id.* at p. 2, ¶ 5.  As soon as the PSA was finalized in June of 1989, Dude was free to marry Shirley, and he did so in November of that same year.  Dude and Shirley remained married for the next twenty-seven years, until Dude's death in 2017.

One of the Plaintiffs, Mimi, testified at trial that when her parents were going through their divorce proceedings in 1988, her mother told her about the PSA.  (Doc. 191, pp. 163–64).  Consequently, Mimi was aware of the contents of the PSA even before it was formally approved by the Chancery Court in 1989.  *Id.* at p. 179.  She also testified that Dude, unlike her mother, "never mentioned the property settlement agreement" to her.  *Id.* at pp. 214–15.  Shirley also testified that Dude never mentioned the PSA during their marriage, and she claims to have had no idea that it existed until Plaintiffs filed the instant lawsuit—almost three years after Dude's death.  (Doc. 190, pp. 191–92).

Dude did engage in estate planning, though not for several years after signing the PSA.  The first will he executed after his divorce from Marillyn was signed 1993.  That

will left nothing to his daughters and everything to Shirley.  *See* Doc. 104-1.  Nearly two decades later, in 2012, Dude hired an attorney to draw up a new will.  At the bench trial of this matter, Shirley testified that she was present during every meeting between Dude and the estate-planning lawyer.  She claims the PSA was never mentioned during these meetings.

According to Dude's 2012 will (Doc. 38-3, pp. 5–28), Shirley was to serve as the executor of his estate upon his death.  She was to supervise the creation of two trusts that would hold Dude's separate assets:  the Bypass Trust and the Marital Deduction Trust.  The Bypass Trust was to benefit Dude's daughters and Shirley's son, Brian Pope, and would be funded with any assets available to pass through probate, free of estate taxes.  *Id.* at § 2.2.A(a).  During trial, the parties agreed that when Dude died, he had exhausted his lifetime gift and estate tax credit, so no assets existed that could have passed into the Bypass Trust tax-free.  The Marital Deduction Trust was to hold the remainder of Dude's assets, and Shirley was to serve as sole trustee and sole direct beneficiary of that trust. Plaintiffs and Brian were named remainder beneficiaries of the Marital Deduction Trust, which meant they would inherit any assets that remained in the trust after Shirley died.  *See id.* at §§ 2.3.B & 2.3.E.  Dude's 2012 will specified that Shirley would have full discretion to pay herself "annually or more frequently all of the net income" of the Marital Deduction Trust as well as "so much or all of the principal" that she desired during her lifetime.  *Id.* at §§ 2.3.C. & 2.3.D.  In other words, she was under no legal

obligation to leave anything in the Marital Deduction Trust for Plaintiffs to inherit upon her death.[2]

In September of 2014, when Dude was eighty-four years old, he suffered a serious fall and hit his head.  Shirley testified at trial that he required constant medical care after this accident and was largely incapacitated until his death. Shirley indisputably took a more active role in managing the couple's investments and businesses from the date of Dude's accident until his passing in April of 2017.  For unknown reasons, Shirley did not open a probate estate at that time, nor did she submit the 2012 will—or any will—to probate; she did not direct the creation of the two trusts specified in the 2012 will; and she did not retitle any assets in the name of either trust identified in the will.  Instead, she retitled all joint assets in her own name and took sole possession of Dude's separate assets.

### III.  PROCEDURAL BACKGROUND

On March 19, 2020, just prior to the three-year anniversary of Dude's death, Plaintiffs filed a petition to open a probate proceeding in the Circuit Court of Sebastian County, Arkansas, knowing that their father had entered into a contract with their mother promising to leave them at least one-half of his estate.  The probate court appointed Separate Defendant Ray Fulmer to serve as the Administrator of Dude's estate.  Shirley

---

[2] On May 21, 2012, approximately a month after Dude signed the 2012 will, he executed a codicil to that will. *See* Doc. 38-3, pp. 29–32. The codicil's only function was to further limit the Plaintiffs' (and Brian's) ability to inherit under the will. Before the codicil was executed, the will had specified that the Plaintiffs and Mr. Pope would inherit under both trusts per stirpes, but the codicil modified §§ 2.3E and 2.4 of the will to eliminate per stirpes inheritance. *See* Doc. 38-3, pp. 29–30.

initially represented to the probate court that Dude's operative will was the one he wrote in 1993, which left his daughters nothing.  She later disclosed the 2012 will.[3]

On March 27, 2020, Plaintiffs filed the instant lawsuit, which asked this Court to find that Dude breached his obligations under the PSA.  The basis for federal jurisdiction was complete diversity of citizenship:  Plaintiffs hale from Texas; Defendants are citizens of Arkansas; and the amount in controversy is well over the $75,000 jurisdictional minimum.  Shirley was named a defendant because she took possession of all of Dude's assets following his death in 2017, and from that point onward, she either maintained, distributed, or sold those assets.  Shirley's son Brian was also named a defendant, as Plaintiffs alleged that Shirley gave Brian some of the assets of Dude's estate that were subject to Plaintiffs' legal claim.  Shirley and Brian took the position during the lawsuit that Dude fully satisfied his promises to Plaintiffs under the PSA through gifts made during his lifetime and bequests he made in his 2012 will.

The parties agreed fairly early on in the litigation that this Court would decide Plaintiffs' breach-of-contract claim on cross-motions for summary judgment.  Those motions (Docs. 89 & 101) were submitted in February of 2021, and after extensive briefing and an in-person hearing, the Court concluded in an Order issued on May 24, 2021, that Dude had breached the will provision of the PSA, that the 2012 will—though legally enforceable—did not satisfy his contractual obligations, and that specific performance was the appropriate remedy for the breach.  *See* Doc. 147.  How to achieve specific performance, however, was a somewhat thorny issue, given the passage of time between

---

[3] It is the Court's understanding that the probate proceedings have since been stayed pending entry of judgment in this case.

Dude's death and the Court's decision.   Shirley and Brian filed a joint motion for

clarification, and the Court responded in an Order filed on July 8, 2021, that explained:

> [S]pecific performance of the contract at issue here—where the breaching party passed away, and the assets that were the subject matter of the contract were devised by will to other heirs or distributed to other parties by operation of law several years ago—requires the use of a constructive trust to eventually reunite legal ownership with equitable and/or beneficial ownership. As the Arkansas Supreme Court explained, "A constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." *Cox v. Miller*, 210 S.W.3d 842, 848 (Ark. 2005). It is not necessary to prove fraud to obtain a constructive trust. *See id.* Rather, the "wrongful disposition of another's property" will create a "duty to convey the property" by means of constructive trust "without regard to the intention of the person who transferred the property." *Id.* at 849.
> . . . .
> In the instant matter, Dude's daughters—the Plaintiffs—were supposed to inherit half of his estate pursuant to a contract Dude entered into before his marriage to Shirley.   Dude did not live up to his obligations under the contract. Although Shirley is innocent in all of this—after all, no one is alleging that she defrauded the Plaintiffs—she will nevertheless be unjustly enriched if she is permitted to retain 100% of the assets of Dude's estate. A constructive trust "on half the property Dude owned and controlled up to the moment of his death, (as well as any post-death interest, earnings, or proceeds)" is the appropriate equitable remedy for Dude's breach of contract. (Doc. 147, p. 17). The identity and value of specific assets meeting that definition are disputed and remain for trial.

(Doc. 167, pp. 4 & 6).

Before the bench trial, the parties stipulated to the identity and value of nearly all

the assets Dude owned and controlled at his death, either individually or jointly with

Shirley.   *See* Doc. 165.   They also stipulated as to which of these assets Shirley still

possessed as of the date of trial.   *Id.*   Finally, they stipulated as to whether and when

Shirley sold certain assets and the sale price of those assets.   *Id.*   After three days of

testimony, the parties[4] were ordered to submit post-trial briefs to discuss their respective theories as to how the Court should account for the assets in Dude's estate that Shirley no longer possessed.  *See* Docs. 187–189.

In the discussion below, the Court will first identify and value the assets Dude owned separately at the time of his death.  Second, the Court will identify and value the assets Dude owned jointly with Shirley at the time of his death.  In itemizing the joint assets, the Court will also consider whether Shirley established at trial any equitable ownership interest in any asset.  Third, the Court will consider whether Dude paid Plaintiffs any amount that could be considered an advance on their inheritance pursuant to the PSA.  Once the assets, their locations, their values, and any credits or offsets are accounted for, the Court will detail how a constructive trust should be equitably impressed in order to remedy Dude's breach of the PSA.

## IV.  DISCUSSION

As noted at the outset of this Opinion, the trial of this matter was limited in scope.  The Court previously determined as a matter of law that Dude breached the PSA.  (Doc. 147, p. 16). At trial, the parties presented evidence and argument so that the Court could determine and effectuate the proper remedy for Dude's breach.  Impressing a constructive trust over one half of the assets in Dude's estate was the appropriate remedy, but identifying and valuing those assets as of the date of Dude's death and then tracing their current location presented significant challenges.  Below, the Court makes the

---

[4] The only parties who participated in the trial were the four Plaintiffs, Shirley, and Ray Fulmer, the Administrator of Dude's estate.  On the day before trial was to begin, Plaintiffs and Brian agreed to certain stipulations of fact in exchange for his release from the lawsuit.  *See* Docs. 172 & 172-1.  The Court granted Plaintiffs' motion and dismissed Brian from the case on the morning of the first day of trial.  *See* Doc. 175.

following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.[5]  The Court's ruling will then be expressed by applying the conclusions of law to the Court's findings of fact.

### A.  Findings of Fact

### 1.  *Dude's Separate Assets*

1.      Dude died on April 15, 2017.

2.      On the date of his death, Dude owned certain separate assets.  Immediately after his death, Shirley took possession of Dude's separate assets and either held or disposed of them as she saw fit.  Shirley's actions were contrary to the 2012 will—of which she was well aware.

3.      Dude's probate estate was eventually opened in the Circuit Court of Sebastian County, Arkansas.  This means that the separate assets Dude owned at the time of his death will now pass through probate.

### a.  RJ Account 827

4.      On the date of his death, Dude separately owned a Raymond James IRA Account ending in 827 ("RJ Account 827"). (Doc. 165, p. 7).

5.      RJ Account 827 was opened by Dude on January 13, 2005. Shirley was named the sole direct beneficiary of the account.  *Id.*  The Plaintiffs were named as contingent beneficiaries. (Plaintiffs' Ex. 69.6).

---

[5] To the extent that any of the Court's findings of fact constitute conclusions of law, or mixed findings of fact/conclusions of law, the Court adopts those conclusions as if they had been restated as conclusions of law. The opposite also applies.

6.      On the date of Dude's death, the value of RJ Account 827 was $722,766.37. The account held the following assets: (1) Raymond James Bank Deposit Program ($214,448.95); (2) Highland Floating Rate Opportunities Fund (Class A) (4,253 shares); and (3) Oppenheimer Steelpath MLP Income Fund (Class A) (63,624 shares). (Doc. 165, p. 7).  The two mutual funds automatically reinvested dividends to acquire more shares of the respective funds. (Doc. 192, p. 18).

7.      In July 2017, Shirley transferred all of Dude's holdings in RJ Account 827 to an IRA account that she opened in May 2017 in her own name, which is referred to here as Raymond James IRA Account ending in 450. (Doc. 165, p. 7).  Shirley added her son Brian as a beneficiary of this account. (Plaintiffs' Ex. 89.1).

8.      One-half the value of the Raymond James Bank Deposit Program, calculated as of the date of Dude's death, is $107,224.47.

9.      Shirley has in her possession at least $107,224.47 from the Raymond James Bank Deposit Program.  These funds are located in her Raymond James IRA Account ending in 450 ("RJ Account 450"). (Doc. 165, p. 7).

10.     The Highland Floating Rate Opportunities Fund (HRFAX) merged in 2017 into the Highland Income Fund (HFRO).  As a result of this merger, Dude's 4,253 shares of this Fund were converted to 2,108 shares.

11.     Shirley still holds all 2,108 of Dude's HFRO shares in RJ Account 450.  (Doc. 165, p. 8).  One-half of the total shares would be 1054 shares.

12.      After Dude's death, his original 63,624 shares of Oppenheimer Steelpath MLP Income Fund (Class A) increased over time because of reinvested dividends. (Compare Plaintiffs' Exs. 61.6 with 63.5).

13.     On February 26, 2020, Shirley sold all of Dude's original holdings in Oppenheimer Steelpath MLP Income Fund (Class A), which had increased by that point to 88,578 shares, for $369,364.97. (Plaintiffs' Ex. 67.7). On that same day, Shirley purchased 500 shares of Apple stock (AAPL) for $151,090.75, and the following day she purchased 100 shares of Alphabet Incorporated Class A stock (GOOGL) for $142,650.94.   *Id*.   RJ Account 450 continues to hold these shares of AAPL and GOOGL (Doc. 165, pp. 7–8), and thus Shirley's sale of Dude's Oppenheimer Steelpath MLP Income Fund (Class A) for $369,364.97 (half of which equals $184,682.48) can be traced to these stock holdings in RJ Account 450.

### b.  Dude, Inc.

14.     According to Dude's tax returns, he owned 100% of Dude, Inc., during taxable year 2016, the year before he passed away.  (Plaintiffs' Ex. 36.50).

15.     Shirley testified at trial that she was "under the impression that [she and Dude] were both 100 percent owners" of the company, but she had no proof to substantiate this assertion.  (Doc. 190, p. 23).

16.     Dude's tax return from 2017 shows that his 100% interest in the company was divided, with him owning 28.8% and Shirley owning 71.2%, which the Court finds represents the percentage of days of the taxable year that Dude was alive.  (Plaintiffs' Exs. 37.60 & 37.62).

17.     Shirley was unable to testify as to the value of Dude, Inc., explaining that she had not done any research and would have to "bone up on it."  (Doc. 190, p. 27).

18.     Shirley testified that she believed the tax returns might have been "wrong in several places," (Doc. 190, p. 23); however, she agreed she had approved of all tax returns before

they were filed, as she was "the liaison" between Dude's companies and the tax preparer. *Id.* at p. 24.

19.    Based on the tax returns and the testimony of Plaintiffs' expert witness, Ms. Cheryl Shuffield, the Court finds that the value of Dude, Inc., as of December 31, 2020, was $4,400,000.00.  *See* Plaintiffs' Exs. 36 & 37; Doc. 191, p. 19; Court's Ex. 1, Dude, Inc. Fair Market Value Analysis.

### c. Premier Foam, Inc.

20.    Shirley testified that Dude owned 90% of Premier Foam, Inc., at the time of his death, and that she owned 10%.

21.    But according to Dude's tax returns, he owned 100% of Premier Foam, Inc., during taxable year 2016, the year before he passed away.  *See* Plaintiffs' Ex. 207.028.

22.    Dude's tax return from 2017 shows that his 100% interest in the company was divided, with him owning 28.8% and Shirley owning 71.2%, which the Court finds represents the percentage of days of the taxable year that Dude was alive.  (Plaintiffs' Ex. 208.19).

23.    Shirley testified with respect to Premier Foam's tax returns that even though she was the "liaison" between the business and the tax preparer, the tax returns were inaccurate.  She testified, "I made a mistake by not being more careful about the tax returns," and claimed that even though the tax returns showed she owned no shares of Premier Foam, Inc., at the time of Dude's death, she actually owned 100 shares, or 10% of the company.  (Doc. 190, p. 31).

24.    Shirley produced in discovery a stock ledger for Premier Foam, Inc. *See* Plaintiffs' Ex. 323.74.  She testified that the stock ledger correctly listed the number of shares of

Premier Foam, Inc., that were owned by each of the shareholders in 2007. *See* Doc. 190, pp. 36–37. Shirley was not listed as a shareholder at that time, and her husband was listed as owning 56% of shares of the company. *Id.*

25.     Shirley produced in discovery the front (but not the back) of a stock certificate for Premier Foam, Inc., dated February 8, 2011. *See* Plaintiffs' Ex. 323.72. The stock certificate indicates that she is the holder of 100 shares of Premier Foam, Inc. However, the only signature on the certificate is that of the secretary of the company, whom Shirley testified was her husband, Dude. Shirley agreed that no other documents existed to prove her ownership of 100 shares of the company. *See* Doc. 190, p. 34.

26.     Shirley also agreed that a man named Pratt Wallace was the president of Premier Foam, Inc., on February 8, 2011, the date that 100 shares of stock were allegedly transferred to her. *See* Doc. 190, p. 40. Mr. Wallace did not sign the stock certificate. *See* Plaintiffs' Ex. 323.72.

27.     Based on Shirley's testimony and the documentary evidence presented at trial, the Court finds that even if Shirley had validly received 100 shares of Premier Foam, Inc. stock on February 8, 2011, she did not own any stock in the company in 2016, the year before Dude's death.

28.     Dude owned 100% of Premier Foam, Inc., at the time of his death.

29.     Based on the tax returns and the testimony of Plaintiffs' witness, Ms. Shuffield, the Court finds that the value of Premier Foam, Inc., as of December 31, 2020, was $12,040,000.00. *See* Plaintiffs' Exs. 207 & 208; Doc. 191, p. 18; Court's Ex. 1, Premier Foam, Inc. Fair Market Value Analysis.

30.    After Dude's death, Shirley received distributions from Premier Foam, Inc., to her BancorpSouth checking account ending in 6671. Those distributions total $3,240,000.00. *See* Plaintiffs' Exs. 208.19, 209.25, 210.029, 211–222; Doc. 190, pp. 44–53.

31.    Shirley testified that Dude loaned Premier Foam, Inc. $10 million at some point prior to his death.  She maintained that at around the time of Dude's death, this loan amount was down to approximately $6 million.  *See* Doc. 190, p. 52.  She claimed that the distributions she received from Premier Foam, Inc., after Dude's death were intended to pay the loan.  The Court finds that, other than Shirley's testimony at trial, there is no evidence of a loan made by Dude to Premier Foam, Inc.  The Court further finds that Shirley's testimony regarding the existence of a loan to Premier Foam, Inc., is not credible, and that distributions she received from the company after Dude's death were simply cash payments.

32.    Half of the distributions Shirley received from Premier Foam, Inc., after Dude's death total $1,620,000.00.

### d.  Dude's Separate Personal Property and Household Effects

33.    The parties represented to the Court that Dude owned certain personal property and household effects at the time of his death, and that these items are currently in Shirley's possession.  (Doc. 165, p. 9).  However, the parties did not offer the Court any details about this separate property, nor did they estimate any values.  The Administrator of Dude's estate has the responsibility to identify and inventory the items in this category.

## 2. *Shirley's Separate Assets (Purchased with Marital Funds)*

34.    Certain items of property were identified by the parties as having been titled in Shirley's separate name before Dude's death even though they were purchased during the marriage with marital funds.

35.    Shirley gave alternate reasons during her testimony as to why these separate properties were titled in her name.  At one point, she suggested they were gifts to her from Dude.  *See* Doc. 190, p. 114.  At another point, she stated that these properties were titled in her name simply because doing so was "expedient."  *Id.* at p. 115.

36.    Real property located at 509 Doubletree Trail, Flower Mount, Texas, was titled in Shirley's separate name during her marriage to Dude but was purchased with marital funds.  One of Shirley's sisters lives in this property rent-free.  (Doc. 190, pp. 94–95).

37.    Real property located at 4806 West Trail Dust Street, Fayetteville, Arkansas, was titled in Shirley's separate name during her marriage to Dude but was purchased with marital funds. Another sister of Shirley's lives in this property rent-free.  (Doc. 190, pp. 95–96).

38.    Real property located at 641 64th Avenue, Marathon, Florida, was titled in Shirley's separate name during her marriage to Dude but was purchased with marital funds. Shirley sold that home in 2020.  (Doc. 190, p. 96).

39.    A Prudential Annuity (Contract Number:  E0483716) was purchased in Shirley's separate name using marital funds.  Testimony at trial indicated that the value of this annuity is $5,500,000.00.  (Doc. 165, p. 9; Doc. 190, p. 98).

40.    Assets titled in Shirley's sole name prior to Dude's death were likely gifts, and, in any event, constitute assets that Dude did not own and control at the time of his death.

Plaintiffs affirmatively disclaim any interest in the properties that are or were titled in Shirley's separate name or in the proceeds from the sale of these properties.

### 3. Assets Dude Owned Jointly with Shirley at His Death

41.     On the date of his death, Dude owned certain assets jointly with Shirley, either in tenancies by the entirety or in joint tenancies with right of survivorship.

42.     Those jointly held assets passed directly to Shirley by operation of law upon Dude's death.

43.     The purchase monies used to buy the jointly held assets originated from Dude, not Shirley.  Testimony at trial confirmed that at the time of her marriage to Dude, Shirley's separate property included, at most, one or two vehicles and $40,000.00 in cash, which she had "earmarked" to pay for her son's college.  (Doc. 190, pp. 230–31).  Dude started Crain Industries, a multi-million-dollar business, decades prior to his marriage to Shirley. She testified that during her marriage to Dude, she helped with Dude's businesses in various ways, and she did not earn a separate income from any job that was unrelated to these businesses.  There was some testimony at trial that Shirley engaged in professional sports fishing during the marriage, but she stated that this was a hobby she did mostly "for fun" and not for profit.  *Id.* at p. 234.

44.     Dude sold Crain Industries in 1995.  Just before the sale, Dude owned 55.72% of the outstanding stock, while his daughters, the Plaintiffs, owned the rest—44.28% of the business. According to the testimony at trial, Dude had to acquire his daughters' stock in Crain Industries before he could sell the company.  (Doc. 191, p. 164).  Mimi testified that her father approached her and her sisters in the early 1990s about buying their stock.  *Id.* At the time, Dude was trustee of his daughters' shares.  *Id.*  All four daughters agreed to

sell their interest in Crain Industries to their father, and he purchased their shares in full before selling the company to the end purchaser. At trial, Mimi produced her written consent to the sale of her shares; that document stated that Dude promised to pay Mimi a total of $3,000,000.00 for her interest in Crain Industries. (Court's Ex. 4). Mimi testified that Dude paid her a total of $1,000,000.00 in installments, but he stopped making payments after 1993 and still owed her $2,000,000.00, plus interest, at the time of his death. *Id.* at pp. 168–69. She produced her tax returns to confirm that Dude made only two installment payments of $500,000.00 each. *See* Court's Ex. 5. Cathee testified that Dude also promised to pay her $3,000,000.00 in installments, plus interest, for her shares in Crain Industries, and that he made the same agreement with her other two sisters, Lisa and Kristan. (Doc. 191, p. 216). Cathee further testified that Dude died still owing each sister the same amount ($2,000,000.00). *Id.*[6]

45.     The purchaser of Crain Industries paid $130,000,000.00 for the business. (Shirley's Ex. 76). Once taxes and liabilities were subtracted from the purchase price, the net cash that was realized from the sale of Crain Industries was $83,926.986.55. *Id.* This money funded most of the purchases and investments that Dude and Shirley made during their marriage.

### a. Real Property

46.     On the date of Dude's death, Dude and Shirley owned the following real property jointly as husband and wife:

- 10101 Dallas Street, Fort Smith, Arkansas (the marital home);

---

[6] Shirley claims that Dude repaid the Plaintiffs in full for the purchase of their stock in Crain Industries. *See* Doc. 191, p. 136. The Court finds Shirley's contention neither credible nor accurate.

- 3655 Beach Way, Van Buren, Arkansas (the ranch);

- 201 West Seaview Drive, Marathon, Florida (the Florida vacation home);

- 6201 State Line Road, Fort Smith, Arkansas (the warehouse);

- 4300 Phoenix Avenue, Fort Smith, Arkansas (Kitties and Kanines); and

- 14805–07 Dutchman Drive, Rogers, Arkansas (the lake house).

(Doc. 165, pp. 8–9).

47.    All of these properties passed directly to Shirley by operation of law at Dude's death.

### *The Marital Home*

48.    The assessed value of 10101 Dallas Street is $7,070,250.00.  (Doc. 165, p. 8).

49.    According to Shirley's testimony, 10101 Dallas Street was built in 2008, and she and Dude lived there together as husband and wife until he passed away.  Shirley worked with an architect to design the house that was situated on that property.  The design was suited to Shirley's taste, and she selected all finishes and furnishings.  She also oversaw the years-long construction of the home, and she still lives there.  (Doc. 190, pp. 126–27).

### *The Ranch*

50.    3655 Beach Way was acquired in 1992 and was the couple's primary home just after they were married.  (Doc. 165, p. 8).  According to Shirley's testimony, she raised horses and cattle at 3655 Beach Way, which she referred to as a "ranch."  (Doc. 190, p. 126).

51.    The appraised value of 3655 Beach Way is $2,497,590.00.  (Doc. 165, p. 8).

52.    After Dude's death, Shirley collected rent for 35 months from renters who were living at 3655 Beach Way.  The amounts of these rent payments varied, but Shirley received these payments consistently from May 1, 2017, through April of 2020 in the total amount of $50,872.24.  *See* Plaintiffs' Ex. 334.  The rent payments were deposited to Shirley's BancorpSouth 6671 checking account.  *Id.*  Shirley still owns this property.

### The Florida Vacation Home

53.    201 West Seaview Drive was acquired in 1994 as a vacation home. (Doc. 165, p. 8).  Shirley testified that when the property was purchased, it was "in terrible condition," and she oversaw all property renovations.  (Doc. 190, pp. 130–31).  She also decorated it to her taste.  *Id.*  Following one or more hurricanes, the house was renovated for a second time, beginning in 2016.  The construction work was only recently completed, and Shirley still possesses this property.  *See id.* at p. 131.

54.    The appraised value of 201 West Seaview Drive is $4,900,000.00.  (Doc. 165, p. 9).

### The Warehouse

55.    6201 State Line Road is a commercial warehouse that is still in Shirley's possession.

56.    Licensed property appraiser Brad Tharpe testified at trial that the habitable square footage of 6201 State Line Road was 262,028 feet.  (Doc. 191, p. 71).  Comparing this property to similar properties in the geographic area, Mr. Tharpe determined that the appropriate price per square foot was $18.00.  Using this figure, Mr. Tharpe valued the property using the market comparison approach and found that the appraised value was $4,720,000.00.  *Id.* at pp. 77–78.  Mr. Tharpe alternatively valued the property using the

income capitalization method, which resulted in a valuation of $4,680,000.00. *Id.* at p. 80. Reconciling these two figures, Mr. Tharpe arrived at a final estimate of the value of 6201 State Line Road of $4,700,000.00. *Id.* at p. 81.

57.     Licensed appraiser Donald Burris also testified at trial. He appraised the property at 6201 State Line Road and believed the gross rentable area was 268,068 square feet, which is about 6,000 square feet more than Mr. Tharpe's measurement. (Doc. 192, p. 138). Mr. Burris used both the market comparison approach and the income valuation approach to determine the appraised value of the property. *Id.* at p. 101. After comparing 6201 State Line Road to similar properties in the area, Mr. Burris decided that the appropriate price per square foot was $14.50, which resulted in a market valuation of $3,910,000.00. *Id.* at p. 109. Using the income capitalization method—and assuming a rental rate comparable with the rates of similar properties in the area—Mr. Burris determined that the value of the property was $3,930,000.00. *Id.* at p. 112. Reconciling these two figures, Mr. Burris arrived at a final estimated value for the property of $3,925,000.00. *Id.*

58.     A tenant has occupied 6201 State Line Road continuously since before Dude died. (Doc. 190, p. 90). After Dude died, the tenant paid rent directly to Shirley. At the time of trial, Shirley had collected fifty months of rent from tenant MP Warehouse, beginning in May of 2017 and continuing through July of 2021. Each month's rent was $38,224.00; after fifty months, the total rent collected by Shirley for this property was $1,911,200.00. (Doc. 190, pp. 92–93; Plaintiffs' Exs. 334.003–334.262).

59.     Mr. Burris's valuation of 6201 State Line Road was likely too low. He testified at trial that when he inspected the property, he observed that a tenant was occupying it.

Even though Mr. Burris was Shirley's retained expert, she did not inform him how much she was charging per month in rent.  When Mr. Burris performed his initial market evaluation of the property, he assumed that $1.65 per square foot was a reasonable rent amount; however, that amount was not calculated based on the actual rent payments Shirley had been collecting.  The Court questioned Mr. Burris during trial, and it appeared that a more reasonable assumption for rent per-square-foot, based on the actual rent Shirley collected, was $1.75 per square foot.  Using that new figure, Mr. Burris calculated that the value of 6201 State Line Road, using the market valuation method, was approximately $4,200,000.00.  (Doc. 192, pp. 137–38).  The Court adopts that valuation and finds that the reasonable fair market value of 6201 State Line Road is $4,200,000.00.

### Kitties and Kanines

60.    4300 Phoenix Avenue in Fort Smith, Arkansas, was a large building that was acquired on or around August 8, 2011, and was jointly owned by Dude and Shirley at the time of Dude's death. (Doc. 165, p. 9). However, in December of 2017, Shirley donated the Phoenix Avenue property to a charity called Kitties and Kanines. *Id.* The Phoenix Avenue property was appraised for $525,000.00.  As a result, Shirley received a tax credit of $236,250.00. *Id.*

61.    Plaintiffs disclaim any right or interest in the Phoenix Avenue property, including its appraised value and any tax deduction Shirley received. (Doc. 192, p. 164).

### Lake House

62.    14805–07 Dutchman Drive in Rogers, Arkansas, was a property consisting of duplexes acquired by Dude and Shirley on or around August 4, 2000.  They were owned jointly by Dude and Shirley at the time of Dude's death. (Doc. 165, p. 9).

63.     Shirley testified that she and Dude bought the duplexes on Dutchman Drive so they could "fish Beaver Lake" in Northwest Arkansas.  (Doc. 190, p. 132).  She also testified that she oversaw the renovation of this property at or around the time of purchase.  *Id.*

64.     On February 21, 2018, less than a year after Dude's death, Shirley sold 14805–07 Dutchman Drive for $350,000.00.   (Doc. 190, p. 89).

65.     As a result of the sale of the Dutchman Drive property, Shirley deposited $325,195.40 in net proceeds in her BancorpSouth account ending in 6671. (Plaintiffs' Ex. 334.213).  One-half of the net proceeds is $162,597.00.

### b.  Cash Held in Joint Bank Accounts

66.     As of the date of Dude's death, he and Shirley possessed joint checking accounts. These were held in the form of joint tenancies with right of survivorship.  (Doc. 165, p. 8).

### *Account 6671*

67.     BancorpSouth Joint Checking Account ending in 6671 contained $149,133.94. Upon Dude's death, Shirley became the sole legal owner of that account.  (Doc. 165, p. 8).  As of the time of trial, the balance in that account was $231,369.18.  (Plaintiffs' Ex. 330.1).

### *Account 2206*

68.     BancorpSouth Joint Checking Account ending in 2206 contained $122,883.37. Upon Dude's death, Shirley became the sole legal owner of that account.  (Doc. 165, p. 8).  The account's balance as of the time of trial was $198,676.19.  (Plaintiffs' Ex. 331.1).

*Account 1312*

69.     BancorpSouth Joint Checking Account ending in 1312 contained $16,162.33. (Doc. 165, p. 8).  Upon Dude's death, Shirley became the sole legal owner of that account. She closed this account in early 2020.  *Id.*  All funds were withdrawn in cash. (Plaintiffs' Ex. 31).  The Court traces this cash to Shirley's primary checking account ending in 6671. Accounts 1312 and 6671 were maintained at the same bank at the same time, and Shirley used them in the same manner, namely, to pay bills and ordinary expenses and to deposit rental payments. *See* Restatement (Third) of Restitution § 59, cmt. f ("If the claimant can trace funds into the hands of a recipient who maintains multiple bank accounts," the court may, based on the facts before it, determine that "two or more accounts should be aggregated" for purposes of tracing funds into the accounts.).

### c.  Regional Jet Center

70.     Regional Jet Center, Inc., is a company that Dude started in 2001.  (Doc. 190, p. 142).  The company is physically located at the Northwest Arkansas Regional Airport near Bentonville, Arkansas.  Regional Jet Center leases the land on which it operates.  *Id*. at p. 54.  It is a fixed-base operation that sells jet fuel to the airlines that operate out of the airport.  (Doc. 191, p. 50).  It also offers aircraft maintenance and other services.  Its facilities include a fixed wing hangar, a gym, a pilot's lounge and sleeping rooms, conference rooms, and a reception area.  It possesses the exclusive right to provide fuel and de-icing services to all planes using the airport.  (Court's Ex. 1, Regional Jet Center, Inc. Fair Market Value Analysis, p. 9).

71.     Shirley testified that Regional Jet Center's ground lease is set to expire in the next six or seven years.  (Doc. 190, p. 54).  Plaintiffs' expert, Ms. Shuffield, testified that she

was provided information confirming that the lease would expire in 2031. *See* Doc. 191, pp. 15–16; Court's Ex. 1, Regional Jet Center, Inc. Fair Market Value Analysis, p. 5.

72.    When Dude started Regional Jet Center, he decided that he and Shirley would jointly own one-sixth of the stock in the company, and their shares would be the only voting shares.  The remaining five-sixths of the stock in the company were nonvoting shares, and they were divided equally among the four Plaintiffs and Brian.  (Doc. 165, p. 10).

73.    Dude and Shirley's one-sixth interest in Regional Jet Center is valued at $1,480,000.00.  (Doc. 191, p. 17; Court's Ex. 1, Regional Jet Center, Inc. Fair Market Value Analysis).

74.    Shirley testified that she "decorated and helped to design the building" where Regional Jet Center operates.  (Doc. 190, p. 148).  After Dude's fall in 2014, she took on an expanded role with more responsibilities.  She testified that she worked with the CEO of the company on repairing and replacing equipment, buying new equipment, and repairing the building and the asphalt roadways.  *Id.* at pp. 148–49.  She also handled "any kind of labor disputes" within the company.  *Id.* at p. 149.  She currently manages (or oversees the management of) most of the operations for the business and is paid a salary of $15,000.00 per year for her efforts, mainly so that she can "draw insurance."  *Id.* at 75. Upon Dude's death, their one-sixth interest in the company became Shirley's by operation of law.

76.    Since Dude's death in 2017, Shirley has received a total of $938,519.00 in stock distributions from Regional Jet Center.  (Plaintiffs' Exs. 240.085, 241.060, 242.109).  Those distributions are traced to Shirley's BancorpSouth checking account ending in

2206.  (Plaintiffs' Exs. 334.264–334.285).  The Plaintiffs have also received distributions since Dude's death (at least through 2019).  (Plaintiffs' Exs. 240–42).

### d.  Airport Transportation Company

77.     Airport Transportation Company was started by Dude in 2002, shortly after he started Regional Jet Center.

78.     Airport Transportation Company is a licensed and bonded freight shipping and trucking company.  It owns tractor trailers and tankers that transport airline fuel in Northwest Arkansas.  It services Regional Jet Center and is responsible for delivering the airline fuel used by Regional Jet Center for planes that fly in and out of Northwest Arkansas Regional Airport in Bentonville, Arkansas. (Court's Ex. 1, Airport Transportation Company Fair Market Value Analysis).

79.     Shirley testified that since Airport Transportation Company's inception, she has been very involved in the operations.  She testified that she has always been responsible for negotiating the contracts for purchasing fuel.  She also stated, "I purchase, or make arrangements to purchase, the trucks, the hauling, the lease from the airport, the tanks." (Doc. 190, p. 157).  She claims she did all of these tasks on behalf of the company both prior to Dude's accident in 2014 and after his accident, continuing to the present day.  *Id.*

80.     Plaintiffs' expert, Ms. Shuffield, valued Airport Transportation Company at $1,705,000.00.  (Doc. 191, p. 17; Court's Ex. 1, Airport Transportation Company Fair Market Value Analysis).  The Court finds this valuation to be accurate.

81.     After Dude's death, Shirley received distributions from Airport Transportation Company.  (Doc. 190, pp. 63–64).

82.    According to the tax returns for Airport Transportation Company for 2017, 2018, and 2019, *see* Plaintiffs' Exs. 21.19, 22.16, 23.15, Shirley's distributions after Dude's death totaled $1,372,000.00.

83.    Plaintiffs were unable to trace exactly where all the distributions from Airport Transportation Company were deposited, but Shirley testified that she believed the distributions went to her BancorpSouth account ending in 6671.  (Doc. 190, p. 64).

### e.  Loan to Brian Pope

84.    Prior to Dude's death, Shirley made certain transfers to her son Brian, his trust, and/or companies affiliated with him, including but not limited to Cognition, Inc., a California corporation; LIT POST, LLC, a California limited liability company; Cognition Corporation, a California corporation; and the ARC/K Project, a California non-profit corporation.  (Doc. 172-1, p. 1).

85.    These transfers totaled $9,100,000.00, and they originated from Dude and Shirley's joint accounts.  (Doc. 172-1, p. 1).

86.    These transfers were loans from Dude and Shirley to Brian.  (Doc. 172-1, p. 1).

87.    After Dude's death, Shirley made other transfers to Brian, his trust, and/or his affiliated businesses in the total amount of $6,000,000.00.   At least $4,650,000.00 of these post-death transfers originated from Shirley's BancorpSouth account ending in 6671.  Shirley does not assert that these post-death transfers were loans.  (Doc. 172-1, p. 2).

### f.  Joint Raymond James Investment Account Ending in 975

88.    At the time of Dude's death, he and Shirley held numerous assets in a joint Raymond James account ending in 975 ("RJ Account 975").  This account held stocks,

mutual funds, bonds, and cash.  Dude and Shirley held the assets in this account as joint tenants with right of survivorship. (Doc. 165, p. 3).

89.    RJ Account 975 was opened on December 19, 2003.  (Doc. 165, p. 3).  The manager of the account was Rob Bandy, who testified at trial.

90.    Mr. Bandy testified that he was previously an account manager at a company called Morgan Keegan & Company, Inc. ("Morgan Keegan"). (Doc. 192, pp. 45–46). Dude and Shirley opened a joint account with Morgan Keegan—with Mr. Bandy as account manager—in October of 2003. (Shirley's Ex. 75).

91    Initially, Dude placed $1,000,000.00 into the Morgan Keegan account, but within a short period of time, Dude added another $12,000,000.00 to the account.  (Doc. 192, p. 48).

92.    Mr. Bandy then became employed by Raymond James, and the Morgan Keegan account in Dude and Shirley's name containing approximately $13,000,000.00 was transferred to Mr. Bandy's new employer and renamed RJ Account 975.  (Doc. 165, p. 3).  Plaintiffs and Brian were named the sole remainder beneficiaries of that account. (Plaintiffs' Ex. 314).

93.    When Dude and Shirley opened the Morgan Keegan account in 2003, they stated that their approximate net worth was $50,000,000.00 and their liquid net worth was $30,000,000.00.  (Shirley's Ex. 75).

94.    At the time of Dude's death, RJ Account 975 had grown in value from $13,000,000.00 to $50,948,766.08.  (Doc. 165, p. 3).  This account became Shirley's by operation of law after Dude's death.

95.    At the time of Dude's death, RJ Account 975 contained the following assets:

- 178,796 shares of Apple stock, which due to a 4 to 1 stock split on August 31, 2020, is now represented by 715,184 shares (Doc. 165, p. 3);

- 3,008 shares of Alphabet, Inc. (Class C), *id.*;

- 3,000 shares of Alphabet, Inc. (Class A), *id.*;

- 455,806.9 shares of J.P. Morgan Municipal Money Market Fund, *id.*;

- 4,676 shares of ConocoPhillips stock, *id.*;

-  5,000 shares of Exxon Mobil Corporation stock *id.*;

- 12,400 shares of Intel Corporation stock, *id.*;

- 2,338 shares of Phillips 66 stock, *id.*;

- 3,120 shares of Procter and Gamble stock, *id.*;

- 700 shares of Tesla Incorporated stock, *id.*;

- 95 shares of Nortel Networks Corporation stock (Nortel Networks is now defunct), *id.* at p. 4;

- 44,122 shares of Invesco Charter Fund (Class A), *id.*;

- 249,153 shares of Invesco High Yield Municipal Fund (Class A), *id.*;

- 66,090 shares of Invesco Limited Term Municipal Income Fund (Class A), *id.*;

- 22,865 shares of American Balanced Fund (Class A), *id.*;

- 21,156 shares of Artisan Mid Cap Value Fund (Investor Class), *id.*;

- 15,525 shares of Black Rock Global Allocation Fund (Class A), *id.*;

- 36,107 shares of Black Rock Multi Asset Income Portfolio Fund (Class A), *id.*;

- 6,440 shares of Capital World Growth & Income Fund (Class F), *id.*;

- 21,034 shares of Franklin High Yield Tax Free Income Fund (Class A), *id.*;

- 8,196 shares of Growth Fund of America (Class F1), *id.*;

- 23,080 shares of Hartford Mid Cap Fund (Class A), *id.*;

- 67,237 shares of Highland Floating Rate Opportunities Fund (Class A), *id.*;

- 57,982 shares of Perkins Mid Cap Value Fund (Class A), *id.*;

- 37,203 shares of Lord Abbett Value Opportunities Fund (Class A), *id.*;

- 28,045 shares of MFS Municipal Limited Maturity Fund (Class A), *id.*;

- 145,234 shares of MFS Arkansas Municipal Bond Fund (Class A), *id.*;

- 87,715 shares of MFS Municipal High Income Fund (Class A), *id.* at p. 5;

- 21,244 shares of PIMCO Global Multi Asset Fund (Class A), *id.*;

- 81,283 shares of Pioneer Classic Balanced Fund (Class A), *id.*;

- 11,194 shares of T. Rowe Price Media and Telecommunications Fund, *id.*;

- 76,159 shares of Prudential Municipal High Income Fund (Class A), *id.*;

- 69,685 shares of Prudential Jennison Small Company Fund Inc. (Class A), *id.*;

- 67,920 shares of Wells Fargo Strategic Municipal Bond Fund (Class A), *id.*;

- 15,000 shares of Ishares Silver Trust, *id.*;

- 2,000 shares of SPDR Gold TR Gold SHS, *id.*; and

- $100,000.00 par value Grand River Dam Authority Oklahoma Revenue Bonds, Series 2008 A (386442TE7), *id.*

### g.  Joint Raymond James Investment Account Ending in 124

96.    At the time of Dude's death, he and Shirley jointly owned another Raymond James account ending in 124 ("RJ Account 124").  At all relevant times, this account held 208 shares of American Airlines Group stock.  (Doc. 165, p. 5).

97.    Dude and Shirley opened RJ Account 124 on March 6, 2014.  (Doc. 165, p. 5).

98.    At the time of Dude's death, this account became Shirley's by operation of law.

### h. Dude's Joint RJ Accounts 975 and 124 Traced to Shirley's RJ Account 061

99.    In May of 2017, the month after Dude passed away, Shirley requested that RJ Accounts 975 and 124 be journaled to a new Raymond James account in her separate name.  (Doc. 165, p. 5).

100.    Shirley's separate Raymond James account ends in 061 ("RJ Account 061"). She reduced Plaintiffs' remainder interest in the new account to 40%.  *See* Doc. 104-14, p. 2. And after that, she eliminated their interest entirely.  *See id.* at p. 3.

101.    As of July 31, 2017, Shirley's RJ Account 061 had a total value of $52,728,621.21. (Doc. 165, p. 5).

102.    As of December 2020, Shirley's RJ Account 061 had a total value of $95,080,993.53. (Doc. 165, p. 5).

103.    As of May 28, 2021, Shirley's RJ Account 061 held the following assets:

- Client Interest Program (Cash Equivalent) in the amount of $4,223,260.44, (Doc. 165, p. 5);

- Raymond James Bank Deposit Program (Cash Equivalent) in the amount of $2,455,156.09, *id.* at p. 6;

- 501,864 shares of Apple stock, *id.*;

- 2,228 shares of Alphabet, Inc. (Class C), *id.*;

- 2,450 shares of Alphabet, Inc. (Class A), *id.*;

- 208 shares of American Airlines Group stock, *id.*;

- 750 shares of Coinbase Global, Inc. stock, *id.*;

- 4,676 shares of ConocoPhillips stock, *id.*;

- 5,000 shares of Exxon Mobil Corporation stock, *id.*;

- 1,840 shares of Home Depot, Inc. stock, *id.*;

- 2,338 shares of Phillips 66 stock, *id.*;

- 650 shares of Roper Technologies stock, *id.*;

- 5,800 shares of Verizon Communications stock, *id.*;

- 132,563 shares of Invesco High Yield Municipal Fund (Class A), *id.*;

- 11,468 shares of Invesco Limited Term Municipal Fund (Class Y), *id.* at p. 7;

- 16,477 shares Black Rock Multi Asset Income Portfolio Fund (Class N/L), *id.*;

- 12,443 shares Franklin High Yield Tax Free Income Fund Advisor (Class N/L), *id.*

- 114,191 shares MFS Arkansas Municipal Bond Fund (Class I), *id.*;

- 30,553 shares of MFS Municipal Limited Maturity Fund (Class I), *id.*;

- 102,416 shares MFS Municipal High Income Fund, *id.*;

- 9,697 shares T. Rowe Price Communications and Tech Fund (Investor Class), *id.*;

- 37,573 shares PGIM Municipal High-Income Fund (Class Z), *id.*;

- 38,093 shares Wells Fargo Strategic Municipal Bond Fund (Class I), *id.*; and

- 2,000 shares SPD Gold Shares, *id.*

104.   The assets in RJ Account 975 that are no longer in Shirley's RJ Account 061 were sold by Shirley. The liquidated proceeds passed through RJ Account 061 and were then used by Shirley for her own purposes.  *See* Plaintiffs' Exs. 257–305 & 332; Doc. 188-3.

105.   In the years following Dude's death, the publicly traded stock that Dude had previously held in RJ Account 975 earned cash dividends.  Those cash dividends were not automatically reinvested but were instead deposited into Shirley's RJ Account 061. The total amount of cash dividends paid since Dude's death is $1,197,081.13.  (Doc. 188-2, listing exhibit numbers).

### 4.  2012 Christmas Gifts

106.   Each of the four Plaintiffs and Brian received a cash Christmas gift from Dude and Shirley in December of 2012.

107.   Each recipient received the same amount:  $1,648,000.00.  (Doc. 165, p. 2).

108.   Just before these gifts were given, Dude executed his 2012 will, (Doc. 38-3, pp. 5–28), which created a trust called the Bypass Trust for the benefit of the four Plaintiffs and Brian.  The Bypass Trust was to be funded with any asset of Dude's estate that was available to pass through probate free of taxes.  *Id.* at § 2.2.A(a).

109.   When Dude and Shirley gave Plaintiffs these gifts, they told them that the gifts exhausted Dude's remaining lifetime gift and estate tax credit.  (Doc. 165, p. 2).  Mimi confirmed this fact in her testimony.  (Doc. 191, p. 184).  Separate Plaintiff Cathee Crain testified that Dude deposited the 2012 Christmas gifts into the Plaintiffs' individual trust accounts.  *Id.* at pp. 223–24.

110.   The individual lifetime gift exclusion amount in 2012 was $5,120,000.00.  In 2017, the individual lifetime gift exclusion amount was $5,490,000.00.  (Doc. 191, pp. 139–40).

111.   There is no evidence that Dude intended the 2012 Christmas gifts to satisfy, in whole or in part, his contractual obligations to Plaintiffs under the PSA.

112.   Shirley did not prove that any other gift Dude gave to Plaintiffs during his lifetime was given in satisfaction of his contractual obligations under the PSA.

### B.  Conclusions of Law

### 1.  General Principles:  Imposition of a Constructive Trust

As previously explained in the Court's Memorandum Opinion and Order on summary judgment (Doc. 147), Dude breached the PSA when he failed to leave at least

one-half of his estate to Plaintiffs.  His 2012 will was insufficient.  The remedy for breach of contract is specific performance; however, because Dude passed away and Shirley did not open a probate estate at the time of his death, his separate assets remained in her possession, and she either retained them or sold them as she saw fit.  Other assets Dude and Shirley owned jointly at the time of his death passed to Shirley by operation of law, and once again, she either kept those assets or sold them.

After considering Shirley's testimony at trial, the Court will accept at face value that she was unaware of Dude's contractual obligations under the PSA until Plaintiffs filed this lawsuit against her and Dude's estate on March 27, 2020.  By contrast, one of the Plaintiffs, Mimi, testified that she was aware of her father's PSA obligations as early as 1988, even before her parents were divorced.  At trial, the other three Plaintiffs, Cathee, Lisa, and Kristan, stipulated that they were also aware of the PSA's requirements at least at the time of their parents' divorce in 1989.  (Doc. 192, p. 140). This means all four Plaintiffs knew that Dude was contractually obligated to leave them one-half of his estate throughout the twenty-seven years Dude and Shirley were married.

As to why Plaintiffs waited almost three years after Dude's death to file suit, the Court surmises that the decision must have depended on Shirley's actions around that time.  As already noted, most of Dude's personal wealth was held in his and Shirley's joint RJ Account 975.  Plaintiffs were the sole remainder beneficiaries of that account, along with Shirley's son Brian, as of the date Dude passed away.  If their beneficial interest had remained unchanged, Plaintiffs would have been poised to collectively inherit 80% of the assets in that joint account once Shirley died.  However, within a month of Dude's death, Shirley reduced Plaintiffs' remainder interest in the account to 40%.   And then she

eliminated their interest altogether—something she was capable of doing as sole owner of the account, but perhaps should not have done.  Though Plaintiffs' decision to file suit several years after Dude's death greatly complicated the task of tracing and valuing assets, it is also true that Shirley's decision to remove Plaintiffs as remainder beneficiaries more than a year after his death must have influenced the timing of this lawsuit. Therefore, to the extent the Court refers to Shirley in the discussion below as an "innocent" recipient of Dude's estate, that term is qualified by the Court's observations above.[7]

The Court looks to Arkansas law when determining Plaintiffs' remedy for breach of contract.  According to state law, "A constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." *Cox v. Miller*, 210 S.W.3d 842, 848 (Ark. 2005).  Here, Shirley—though she may not have known it at the time— was under a legal duty to maintain Dude's assets after his death so half of it could be conveyed to Plaintiffs.  The "wrongful disposition of another's property" will create a "duty to convey the property" by means of a constructive trust "without regard to the intention of the person who transferred the property." *Id.* at 849.  In other words, even though Shirley believed she was entitled to inherit all of Dude's property, both separate and joint,

---

[7] To be sure, the Court finds troubling several of Shirley's actions *after* Dude died.  For example, Shirley had to have known about Dude's 2012 will because she was present with Dude and the lawyer who prepared it.  Yet, Shirley did not seek to probate Dude's separate assets in the manner dictated by the will.  And when the Plaintiffs petitioned to open a probate estate, Shirley initially filed the 1993 will that left Plaintiffs nothing. When questioned at trial about these decisions, she testified, "I forgot all about that [2012] will because . . . I had been through several chemo, radiation, comas, a lot of things."  (Doc. 190, p. 214).  The Court finds her explanation to be not credible.

the property was, in a sense, encumbered by a prior legal obligation. Dude signed the PSA prior to his marriage to Shirley, so this obligation took precedence over Shirley's ordinary inheritance rights as a widow pursuant to Arkansas law. *See Gregory v. Estate of Gregory*, 866 S.W.2d 379, 383 (Ark. 1993) (finding that "the superior contractual rights" of the deceased's children, who were beneficiaries of their father's contract to make a will, superseded the widow's dower and homestead rights).[8]

The Arkansas Supreme Court has recognized the "two competing public policies" at issue here: "the right of a couple to contract to make mutual wills that are irrevocable and that dispose of both estates to third-party beneficiaries, and the right of a surviving spouse to take an elective share." *Gregory*, 866 S.W.2d at 382. Under Arkansas law, the PSA's contractual provisions are "applicable to property held by the spouses in an estate by the entirety, even though it would not pass under the will of either spouse but would devolve on the surviving spouse by operation of law." *Janes v. Rogers*, 271 S.W.2d 930, 933 (Ark. 1954). This case presents complicated facts not often encountered by federal courts, but at bottom, this is a breach-of-contract dispute. The Court, sitting in diversity, must remedy the breach using its legal and equitable powers.

---

[8] During trial, Shirley testified many times that she was told by her husband throughout their marriage, "What's mine is yours, and what's yours is mine." (Doc. 190, pp. 125, 133, 136). If Dude's representations were accurate, then it might be understandable why Shirley would have believed that all of Dude's assets—both in life and in death—were also hers. It would also explain why Shirley views the act of carving up these assets and distributing them to the Plaintiffs to be unjust. The problem, of course, is that Shirley was not told the truth about these assets during her marriage: *All that was Dude's was not hers.* He owed a preexisting obligation to his daughters. In all practical effect, half of Dude's assets were at all times encumbered by the PSA. Possibly he tried to address that obligation by creating his 2012 will and by naming his daughters as beneficiaries of the joint RJ Account 975; but as we know now, the 2012 will was not enough to satisfy his obligations under the PSA, and Shirley removed Plaintiffs as remainder beneficiaries of the joint account after Dude's death.

For the assets that were owned individually by Dude and are subject to probate court jurisdiction, this Court is nevertheless empowered to adjudicate the parties' rights in such property and enter an order declaring such rights. *See Marshall v. Marshall*, 547 U.S. 293, 310 (2006) (establishing that federal courts have "jurisdiction to adjudicate rights in property" that is within the custody of the probate court). For the assets that were jointly held and therefore will not pass through probate, this Court has the authority, under Federal Rule of Civil Procedure 70, to divest Shirley of title and vest it directly in Plaintiffs. *See* Fed. R. Civ. P. 70(b); Howard W. Brill, Equity and the Restitutionary Remedies: Constructive Trust, Equitable Lien, and Subrogation, 1992 ARK. L. NOTES 1, 5 (1992) ("[I]f the property is within the jurisdiction of the court, the court may divest the defendant of title and directly vest it in the plaintiff.").

## 2.  Burdens of Proof

"A constructive trust is simply an equitable remedy." *Cole v. Rivers*, 861 S.W.2d 551, 553 (Ark. Ct. App. 1993). The party seeking the imposition of a constructive trust must persuade the court, sitting in equity, through clear and convincing evidence. *Nichols v. Wray*, 925 S.W.2d 785, 789 (Ark. 1996).

> Clear and convincing evidence is evidence by a credible witness whose memory of the facts about which he testifies is distinct, whose narration of the details is exact and in due order, and whose testimony is so direct, weighty, and convincing as to enable the factfinder to come to a clear conviction, without hesitance, of the truth of the facts related. It is simply that degree of proof that will produce in the trier of fact a firm conviction of the allegations sought to be established.

*First Nat'l Bank of Roland v. Rush*, 785 S.W.2d 474, 479 (Ark. Ct. App. 1990).

In the case at bar, Plaintiffs agree that they bore the burden of identifying at trial which property Dude owned and controlled just prior to his death and any growth or

36

increase in that property since his death, while Shirley agrees that she bore the burden of proving any entitlement to a setoff or credit.  (Doc. 165, p. 1).  The parties introduced thousands of pages of evidence at trial, including the testimony of the parties and several experts, as well as reams of documents that included business records, financial reports, and tax returns.  Appellate courts in Arkansas ordinarily "defer to the superior position" of the trial court "to evaluate the evidence" and will not reverse a finding "that the disputed fact was proved by clear and convincing evidence" unless that finding was "clearly erroneous."  *Nichols*, 925 S.W.2d at 789.  "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Id.*

### 3.  Arkansas Law Regarding Jointly Held Property

The most disputed properties are those that were held jointly by Dude and Shirley as husband and wife, either in tenancies by the entirety or joint tenancies with right of survivorship.  These jointly held properties passed by operation of law to Shirley after Dude died.  According to the Arkansas Supreme Court, a "[t]enancy by the entirety is a joint tenancy modified by the common law doctrine that husband and wife are one person in law, and cannot take by moieties." *Parrish v. Parrish*, 235 S.W. 792, 794 (Ark. 1921). "Thus neither spouse owns an undivided one-half interest in any entirety property—the entire entirety estate is vested and held in each spouse." *Wood v. Wright*, 386 S.W.2d 248, 251 (1965).  This means that when Dude was alive, he and Shirley each owned 100% of the funds in their joint banking and investment accounts.  Dude could have legally withdrawn 100% of such funds without Shirley's permission—and vice versa—since they each legally owned an undivided interest in the joint accounts.

Though the facts at trial proved that Dude contributed 100%--or very close to that—of the consideration used to fund his and Shirley's joint accounts and joint real property, when one spouse furnishes all the consideration to buy joint marital property, Arkansas law dictates that "there is a presumption of a gift to the other [spouse] from the one furnishing the consideration." *Jones v. Wright*, 323 S.W.2d 932, 933 (Ark. 1959) (citation and quotation marks omitted). That gift represents "half the value of the use [of the property] during their joint lives and of the right of survivorship" after death. *Id.* (citation and quotation marks omitted). "This presumption, although a strong one, may be overcome by clear and convincing proof that no such gift was intended." *Bank of Roland*, 785 S.W.2d at 478.

The Court interprets the holding in *Jones* to mean that even though Dude provided the consideration used to purchase all marital assets, he minimally gifted "half the value of the use" of such property to Shirley to use and enjoy during their marriage and he attempted to gift the whole of such property outright to her at death—which follows the legal definition of "right of survivorship." Gifting "the use" of jointly held property is not the same as making a completed gift of ownership.

It is clear that Dude made four completed gifts to Shirley of property purchased with marital funds: (1) 509 Doubletree Trail, Flower Mount, Texas; (2) 4806 West Trail Dust Street, Fayetteville, Arkansas; (3) 641 64th Avenue, Marathon, Florida; and (4) Prudential Annuity Contract Number E0483716. All four of the above assets were specifically titled in Shirley's name. The Court is well persuaded that Dude and Shirley understood the distinction between properties Shirley legally owned separately—as a result of completed gifting—and property she owned jointly with Dude. If Dude had

wanted to gift Shirley with title to more separate property than the four assets itemized above, he knew how to do so.  Moreover, the presumption of a gift becoming complete upon the fruition of survivorship rights is trumped by Plaintiffs' superior contractual rights under the PSA.  The same is true of Shirley's dower and curtesy rights.  *See supra*, pp. 35–36.

### 4.  Shirley's Equitable Interest in Jointly Held Property

Since the Court's task is to impress a constructive trust on the assets Dude owned shortly before his death, the next question is whether Shirley acquired an equitable interest in any of the couple's joint assets during Dude's lifetime.  Equitable ownership is different from the right to use and enjoy property.  Certainly, Shirley had the right to use and enjoy all jointly held marital property while Dude was alive; however, the Court must discern, by clear and convincing evidence, whether she established equitable *ownership* of any jointly held property during Dude's lifetime, by virtue of her contributions in maintaining, developing, or increasing the value of any jointly held property.  *Cf. Nelson v. Nelson*, 590 S.W.2d 293, 296 (Ark. 1979) (finding that evidence of a spouse's joint work, labor, management, and acquisition of property entitled her to "equitable ownership of one-half interest in [the] property").

The most convincing evidence Shirley presents of her equitable interest in joint property is the fact that Dude was mentally and physically incapacitated during the last three years of his life and required around-the-clock care.  Plaintiffs did not dispute this. They also did not dispute that during these years, Shirley singlehandedly ran (or at least had the responsibility to oversee) all the joint businesses, maintained all joint property, and handled all joint investment decisions.  Before trial, Plaintiffs threatened to put on

proof that Shirley had "little to no involvement in Dude's companies" and instead employed business tactics that were "distracting."   *See* Plaintiffs' Amended Pretrial Brief, Doc. 173-1, p. 17.  However, they never presented such proof.

For her part, Shirley testified that she was involved in all aspects of the businesses from the beginning of the marriage.  For example, she testified that she maintained an office at Dude, Inc.  (Doc. 190, p. 137).  She said that when Dude "would anticipate doing a deal for a job," he would ask her "to find out as much about the background of say another company that [they] were anticipating looking at, or if [they] were going to hire somebody, or just the detail end of it."  *Id.*  And then she and Dude would get together and talk about what she had discovered, and "a lot of times, he did things on his own and then would bring them back to [Shirley] to look at."  *Id.*  She also personally met with customers and traveled with Dude to the foam production plants.  *Id.*  When her counsel asked whether she was involved in "reviewing the financials of customers," Shirley responded, "Not to some great degree," as "numbers don't sit in [her] head very long," but that she could be counted on to tell "if something is a good or a bad deal based upon the bottom line."  *Id.* at p. 138.  In other words, the Court concludes that Dude consulted with Shirley, relied on her instincts, and made her aware of certain aspects of the businesses over time.  And by the time Dude was incapacitated in 2014, Shirley knew enough about the businesses and investments to run them herself.

Still, while attempting to carrying her burden here, Shirley offered no theories or guiding principles as to how the Court should quantify her contributions to the various businesses prior to 2014.  Further, although she identified herself as "the liaison" between the various companies and the accountant who prepared all business tax returns during

the marriage, *id* at p. 24, she constantly disputed the accuracy of those tax returns during the trial, particularly when she understood that the returns had failed to substantiate her position regarding her legal ownership of Dude's separate property.  *See, e.g., id.* at p. 31.  She also admitted she was not "vigilant" in focusing on the details of the tax returns and only tended to worry about the bottom-line amount that she and Dude owed in taxes. *Id.* at p. 103.  Finally, with respect to Shirley's investment decisions, Rob Bandy, the manager of the Crain family's Raymond James investment accounts, testified that Shirley was instrumental in growing those accounts since 2014, *see* Doc. 192, p. 62; however, there was little evidence offered about her role in investment decisions, and how to value that work, prior to 2014.

Shirley's credibility also suffered some damage during the trial.  She blamed recent lapses in memory—particularly her decision to submit Dude's outdated will from 1993 to the probate court—to the effects of chemotherapy and radiation treatment she underwent several years ago.  *See, e.g.*, Doc. 190, p. 214.  She also claimed that until the instant litigation began, she did not quite remember—due to her "spotty memory" from the effects of chemotherapy—who owned shares in Regional Jet Center.  *Id.* at p. 216.  She even testified—incredibly—that she "really didn't remember that even [her] son had 1/6th" of the shares in this family business "until [she] started looking for the papers that [she] was asked to look for" in this lawsuit.  *Id.*

The Court therefore concludes that Shirley's equitable contribution to the joint businesses and joint investment and bank accounts from 1989 to 2014 was more than negligible, but impossible to quantify under a clear-and-convincing evidence standard. What she did prove was that she solely managed the joint businesses and accounts

during the last three years of her marriage, while Dude was incapacitated.  By comparison, Dude had zero involvement in the managing of the joint businesses and accounts in those years.  Since Dude and Shirley were married for a bit less than thirty years, three years of that time is roughly equal to 10% of the length of the marriage.  The Court therefore finds that Shirley established an equitable right to ownership of 10% of the couple's jointly-held businesses, joint investment accounts, and joint bank accounts, which is equal to approximately the percentage of time in the marriage that these joint assets were under her sole control.  Pursuant to this finding, and for the purpose of impressing a constructive trust, only 90% of these *joint* assets will be considered for inclusion in Dude's "estate" at the time of his death, while 100% of Dude's *separate* assets passing through probate will be subject to Plaintiffs' legal claim.

### *Regional Jet Center*

One important exception to the Court's decision above concerns Dude and Shirley's joint interest in Regional Jet Center.  This business asset is different from the rest because when Dude first formed the company, he decided to share ownership equally with the four Plaintiffs and Brian.  Dude and Shirley owned one-sixth of the business, Brian owned one-sixth, and the Plaintiffs collectively owned four-sixths.  It follows that since the Plaintiffs have always owned more than half of Regional Jet Center, Dude fulfilled his PSA obligations with respect to this particular asset. Moreover, the Court is persuaded that Shirley has been personally involved in the day-to-day management of this business over the years, and her individual contributions are substantial enough to make her the sole equitable owner of the shares she once jointly owned with Dude.  Accordingly, Shirley will maintain sole ownership of her Class A voting stock in Regional

Jet Center, as well as any cash distributions she received from Regional Jet Center after Dude's death.

### *Jointly Held Real Property*

Another exception applies with respect to certain jointly held *real* property.  The Court finds that Shirley proved her equitable ownership to more than a 10% interest in three homes that she shared with Dude prior to his death.  First, she established that she equitably owned half of the couple's marital home located at 10101 Dallas Street, Fort Smith, Arkansas.  She testified credibly that she fully designed the home, coordinated with the architect and the contractors in selecting all building materials and making sure all construction work was completed, and selected all furnishings and artwork.  (Doc. 190, pp. 126–27). Though Dude provided the monetary consideration for the home, Shirley contributed "sweat equity" in the form of significant creative and managerial decision-making and time-related investments beginning in 2003, when the land was first purchased, and continuing to the date of Dude's death in 2017.

Second, Shirley established equitable ownership of half of the ranch at 3655 Beach Way, in Van Buren, Arkansas.  Dude paid the monetary consideration for this home in 1992, shortly after he and Shirley were married, but she credibly testified that she was responsible for overseeing the tear down of an existing home on the land and for building the current structure.  (Doc. 190, p. 128).  She took care of several horses on the land and materially contributed to decisions about how the land and fixtures that ran with the land would be maintained.

Third, Shirley established a one-half equitable ownership interest in the couple's vacation home located at 201 West Seaview Drive in Marathon, Florida.  Shirley credibly

testified that Dude provided the consideration to purchase the home in 1994, but it "was in terrible condition," so Shirley directed the renovation of the property and the decoration. (Doc. 190, p. 130). She and Dude spent "quite a bit of time there." *Id.* In addition, Shirley testified that a least three hurricanes did damage to the home, and the last hurricane that struck just prior to Dude's death "pretty much demolished the understructure," such that she and Dude decided to "start over" and build the home from scratch. *Id.* at p. 131. Construction began in 2016, while Dude was fully incapacitated, and Shirley oversaw and directed the work. *Id.*

However, other than the three properties specifically noted above, Shirley did not meet her burden to prove any equitable ownership interest in jointly held real property.

### 5. Equitable Treatment of Property No Longer in Shirley's Possession

Several assets that were owned jointly by Dude and Shirley at the time of Dude's death are no longer in Shirley's possession. Plaintiffs are the rightful owners of some of this property, pursuant to the PSA. Under English common law, the rightful owner of property subject to a constructive trust may follow and retake her property from the trustee only if it "[can] be ascertained to be the same property, or the product or proceeds thereof"; however, the "right cease[s] when the means of ascertainment fail[s], as when the subject of the trust was money, or had been converted into money, and then mixed and confounded in a general mass of money of the same description, so as to be no longer divisible or distinguishable." *Nonotuck Silk Co. v. Flanders*, 58 N.W. 383, 384 (Wis. 1894) (citing cases).

The Restatement (Third) of Restitution § 59 provides:

(1) If property of the claimant is deposited in a common account or otherwise commingled with other property so that it is no longer separately

> identifiable, the traceable product of the claimant's property may be identified in (a) the balance of the commingled fund or a portion thereof, or (b) property acquired with withdrawals from the commingled fund, or a portion thereof, or (c) a combination of the foregoing, in accordance with the rules stated in this Section.

*Id.* at § 59(1).

Subsections (2) and (3) set forth the rules for determining a claimant's right to assets in a commingled fund.  Subsection (2) states:

> (2) If property of the claimant has been commingled by a recipient who is either a wrongdoer (§ 51) or responsible for unjust enrichment (§ 52), the following rules apply: (a) Withdrawals that yield a traceable product and withdrawals that are dissipated are marshaled so far as possible in favor of the claimant. (b) Subsequent contributions by the recipient do not restore property previously misappropriated from the claimant, unless the recipient affirmatively intends such application. (c) After one or more withdrawals from a commingled fund, the portion of the remainder that may be identified as the traceable product of the claimant's property may not exceed the fund's lowest intermediate balance.

*Id.* at § 59(2).

Subsection (3) explains what happens to commingled property when the recipient is "innocent" and did not obtain the property through fraudulent or deceptive means:

> (3) If property of the claimant has been commingled with property of an innocent recipient (§ 50), *the claimant may trace the property into the remaining balance of the fund* and any traceable product of the fund *in the manner permitted by § 59(2)*; *but restitution from the property so identified may not exceed the amount for which the recipient is liable* . . . .

*Id.* at § 59(3) (emphasis added).  In other words, even with an innocent recipient, the general "marshaling rule" explained in § 59(2) applies.

> The composite elements of this "marshaling" are, of course, (1) *the presumption that the holder of the commingled fund dissipates [her] own money first* (so long as the balance permits), and (2) the contrary presumption that the holder is withdrawing the claimant's money (again so long as the balance permits), if the claimant seeks to identify an asset acquired by withdrawal as the traceable product of the claimant's funds.

45

*Id.* at § 59, cmt. d (emphasis added).

Here, the Court finds that Shirley was an innocent recipient of Dude's assets held in their joint accounts. Plaintiffs are the "claimants"—using the Restatement's terminology—who maintain that pursuant to the PSA, only half the assets Shirley received legally belonged to her, while the other half belonged to Plaintiffs. We know that after Dude's death Shirley retitled the RJ accounts in her sole name and that she retained most of those exact same stocks in her new account. And the proceeds of the stocks that she did sell are easily traceable. So, a remaining question is: When Shirley sold some of Dude's assets, should the Court assume that the assets sold were from Shirley's half and not Plaintiffs'? Based on the Court's reading of the Restatement, it appears the answer to that question is "yes." Plaintiffs explain that if the Court adopts this methodology when placing assets into a constructive trust,

> Plaintiffs may end up with more than one-half of the assets Shirley *currently* controls, [but] Shirley will not be left in a "worse off" position: She has withdrawn and spent (not reinvested) over 30 million from the Raymond James investment account since Dude's death in 2017, and Plaintiffs are not seeking any of those funds. (*See* Pls.' Exs. 264, 276, 288, 300, and 332, showing the total annual withdrawals from the Raymond James investment account from 2017 to present).

(Doc. 188, p. 8).

Plaintiffs argue that "[t]o prevent unjust enrichment of the $30 million Shirley has withdrawn and sold," her withdrawals from the joint accounts must be subtracted from *her* half, and not from Plaintiffs' half. *Id.* The Court agrees. So, if 100 shares of company XYZ were Dude's when he died, and Shirley sold 50 shares sometime after his death, Plaintiffs would be entitled to the 50 shares remaining in the account, as under Plaintiffs' theory it would be assumed Shirley sold her own shares first. Importantly, Plaintiffs claim

no entitlement to the assets Shirley acquired with sale proceeds from *her portion* of the jointly held shares.[9]

According to the Raymond James account statements, Account 061 nearly doubled in value from July 2017 to December 2020. *See supra*, ¶¶ 101–02.  This was likely due to the incredible rise in the stock market during those years.  The Plaintiffs and Shirley will equally benefit from the gains the stock market produced—just as they would have equally suffered losses had the market taken a downward turn.  The Restatement provides that "[a]n innocent recipient" like Shirley "may be liable in an appropriate case for use value or proceeds [of an asset], but not for consequential gains."  Restatement (Third) Restitution § 50(5).  This Court finds that Shirley is liable to the Plaintiffs for the "use value" and "proceeds" of the stocks that remained in this account after Dude's death and increased in value.[10]

To the extent there is insufficient cash to cover Plaintiffs' share of jointly held assets, a constructive trust may be imposed on an asset that is "an effective substitute

---

[9] For example, Shirley liquidated shares of Apple stock after Dude's death and used the proceeds to buy a jet. Since it is presumed in the law that Shirley sold her own Apple shares first, and not the Plaintiffs', the jet belongs to Shirley, and Plaintiffs cannot claim an ownership interest in the jet.

[10] "Proceeds" are defined in the Restatement as "the direct product of an asset," and they include "ordinary income or accretion in respect of the original asset."  Restatement (Third) Restitution § 53(2).  By contrast, a "consequential gain" results from an innocent recipient's "subsequent dealings with such an asset," which requires affirmative "intervention" on the recipient's part to affect the value of the asset.  Restatement (Third) Restitution § 53(3) & reporter's note c.  Here, the accretion in value of the stock owned by Dude at the time of his death is the result of Shirley's passive holding of stock in a bull market.  There is no credible evidence that Shirley actively intervened to cause the value of RJ Account 061 to double, so she is not entitled to keep all of that value as a consequential gain.

for another, even if the substitute would not meet [the] normal definition of 'traceable product,'" if "there is an unmistakable relationship between the claimant's loss of one . . . asset and the recipient's gain of another," and the "circumstances of the transaction reveal unjust enrichment of the recipient at the expense of the claimant."  Restatement (Third) Restitution § 58, cmt. f.  Therefore, to the extent Plaintiffs' assets are traced to an account that does not contain sufficient funds, other assets within that same account—or assets purchased from commingled funds that were previously held in that account—may be substituted and liquidated to pay Plaintiffs.

### 6. *Treatment of the 2012 Christmas Gifts*

For a gift to be applied towards satisfaction of Dude's obligation under the PSA, a reference to such obligation must be tied to the transaction; otherwise, it is merely a gift that does not reduce the balance of the obligation. *See* 95 C.J.S. Wills § 137.  Shirley failed to prove by clear and convincing evidence that Dude intended the 2012 Christmas gifts to partly satisfy his contractual obligation to Plaintiffs under the PSA.  Though Plaintiffs understood these gifts were advances on their inheritance, such advances were not necessarily made in satisfaction of the PSA.  Dude could have left Plaintiffs more than one-half of his estate; no clear and convincing evidence exists to persuade the Court that the 2012 gifts were made *in partial satisfaction of* the PSA, as opposed to *in addition to* the PSA.  Therefore, these gifts will not be credited back to the estate or serve as an offset to the amounts owed by the estate to Plaintiffs.

## C.  Application of Law to Findings of Fact

Based on the Court's findings of fact and conclusions of law as set forth above, the following assets (or interests therein) are impressed with a constructive trust for Plaintiffs' benefit.

| 1.  Assets Dude Owned Individually[11] | | |
|---|---|---|
| **Asset** | **Portion Impressed with Constructive Trust for Plaintiffs' Benefit** | **Explanation and Tracing** |
| **a. RJ Account 827** | | |
| • Deposit Program | $107,224.47, cash | This cash amount equals 50% of the Raymond James Bank Deposit Program holdings on the date of Dude's death. These funds are traced to Shirley's Bank Deposit holdings in RJ Account 450 |
| • Highland Income Fund (HFRO) | 1,054 shares | This amount of shares equals 50% of the shares Dude held in this account at the time of his death. These shares are traced to RJ Account 450. |
| • Oppenheimer Steelpath MLP Income Fund Class A | $184,682.48, cash | This cash amount equals 50% of the proceeds Shirley received from the sale of 88,578.159 shares on or about February 26, 2020. These proceeds are traced to RJ Account 450. |
| **b. Dude, Inc.** | 50% of all outstanding shares | |

---

[11] This table reflects the Court's adjudication of Plaintiffs' rights in Dude's separate assets at the time of his death—even though his separate property must pass through probate. Marshall, 547 U.S. at 310. Thus, the assets itemized here are impressed by the constructive trust but the actual transfer will be administered by the Sebastian County Probate Court.  In this regard, it should be made known that Plaintiffs stipulated in open

49

| c. Premier Foam, Inc. | | |
|---|---|---|
| • Shares | 50% of all outstanding shares | |
| • Distributions | $1,620,000.00, cash | This cash amount represents 50% of the cash distributions Shirley received from Premier Foam, Inc., after Dude's death. These proceeds are traced to Shirley's BancorpSouth checking account ending in 6671.[12] |
| d. Dude's Separate Personal Property and Household Effects | 50% of the separate personal property and household effects Dude owned at the time of his death | The entirety of such items will be inventoried by the Administrator in the normal course of the probate proceedings, and as ultimately determined by the probate court. |

court on the last day of trial, July 21, 2021, that they will only claim through the probate process those assets (itemized here) that are impressed by the constructive trust for their benefit.  *See* Doc. 192, p. 260 ("The plaintiffs anticipate and will make no claim for any assets out of that probate estate, other than the assets that may be under a constructive trust issued by this Court.").

[12] If the cash in this account is insufficient to fund the constructive trust for Plaintiffs benefit, then—by agreement of the parties—Shirley will substitute equivalent assets from her RJ Account 061. More specifically, the parties stipulated that after Dude's death, Shirley gave a gift of $6,000,000.00 to Mr. Pope, at least $4,650,000.00 of which came from her BancorpSouth checking account ending in 6671. (Doc. 172-1, p. 2).  They further agreed that if the BancorpSouth 6671 account balance is insufficient to pay Plaintiffs for any assets that the Court traces to the account, then Shirley will substitute equivalent assets for her RJ Account 061.  *Id.* at pp. 2–3.

| 2. Real Estate Dude Owned Jointly with Shirley.[13] | | |
|---|---|---|
| **Asset** | **Portion Impressed with Constructive Trust for Plaintiffs' Benefit** | **Explanation and Tracing** |
| **a. 1010 Dallas Street, Fort Smith, Arkansas** | 25% ownership interest in this property<br><br>$7,070,250.00 assessed value | Shirley may elect whether to execute a deed transferring 6.25% ownership interest to each of the four Plaintiffs or to pay the Plaintiffs collectively the cash equivalent of 25% ownership interest in this property, which the Court finds is equal to $1,767,562.50. |
| **b. 3655 Beach Way, Van Buren, Arkansas**<br><br>• Property | 25% ownership interest in this property<br><br>$2,497,590.00 assessed value | Shirley may elect whether to execute a deed transferring 6.25% ownership interest to each of the four Plaintiffs or to pay the Plaintiffs collectively the cash equivalent of 25% ownership interest in this property, which the Court finds is equal to $624,397.50. |
| • Rental Income | $12,718.06, cash | This cash amount equals 25% of the rent payments Shirley collected on this property since Dude's death. These proceeds are traced to Shirley's BancorpSouth checking account ending in 6671. |
| **c. 201 West Seaview Drive, Marathon, Florida** | 25% ownership interest in this property<br><br>$4,900,000.00 assessed value | Shirley may elect whether to execute a deed transferring 6.25% ownership interest to each of the four Plaintiffs or to pay the Plaintiffs collectively the cash |

---

[13] The Real Property described in this table was jointly held by Dude and Shirley. Upon Dude's death the entirety of his interest passed to Shirley by operation of law. It is therefore not anticipated that these properties will pass through the probate estate. The properties are nevertheless impressed by the constructive trust and Shirley is responsible for conveying directly to (or buying out) Plaintiffs' ownership interests as described in this table.

| | | |
|---|---|---|
| | | equivalent of 25% ownership interest in this property, which the Court finds is equal to $1,225,000.00. |
| **d. 6201 State Line Road, Fort Smith, Arkansas** | | |
| • Property | 50% ownership interest in this property<br><br>$4,200,000.00 total property value as determined by the Court | Shirley may elect whether to execute a deed transferring 12.5% ownership interest to each of the four Plaintiffs or to pay the Plaintiffs collectively the cash equivalent of 50% ownership interest in this property, which the Court finds is equal to $2,100,000.00. |
| • Rental Income | $955,600.00, cash | This cash amount equals 50% of the rent payments Shirley collected on this property since Dude's death. These proceeds are traced to Shirley's BancorpSouth checking account ending in 6671. |
| **e. 14805–07 Dutchman Drive, Rogers, Arkansas** | $162,597.00, cash | This cash amount equals 50% of the net proceeds ($325,195.40) Shirley received for the sale of this property. These proceeds are traced to Shirley's BancorpSouth checking account ending in 6671. |

| 3. Bank Accounts Dude Owned Jointly with Shirley | | |
|---|---|---|
| **Account** | **Portion Impressed with Constructive Trust for Plaintiffs' Benefit** | **Explanation and Tracing** |
| **a. BancorpSouth Joint Checking Account ending in 6671** | $67,110.27, cash | This cash amount equals 45% of the cash contained in the account at the time of Dude's death ($149,133.94). These funds are traced to Shirley's BancorpSouth Checking Account ending in 6671. |
| **b. BancorpSouth Joint Checking Account ending in 2206** | $55,297.52, cash | This cash amount equals 45% of the cash contained in the account at the time of Dude's death ($122,883.37). These funds are traced to Shirley's BancorpSouth Checking Account ending in 2206.[14] |
| **c. BancorpSouth Joint Checking Account ending in 1312** | $7,273.05, cash | This cash amount equals 45% of the cash contained in the account at the time of Dude's death ($16,162.33). This account was closed on March 2, 2020, and Shirley withdrew all remaining funds in cash. These funds are therefore traced to Shirley's primary checking account, which is the BancorpSouth Checking Account ending in 6671. |

---

[14] If the cash in this account is insufficient to pay Plaintiffs, Shirley testified that she purchased a number of assets after Dude passed away using funds from this account. *See* Doc. 190, pp. 60–63. Accordingly, the evidence at trial clearly and convincingly shows that the following assets are traced to this account, and if necessary, can be sold to pay any amount that is owed to Plaintiffs from this account: antique paintings from Sotheby's in the amount of $631,062.50 (Plaintiffs' Ex. 334.418); furnishings from Ida Manheim Antiques in the amount of $119,800 (Plaintiffs' Ex. 334.401); a Sea-Doo from Bradford Marine in the amount of $38,127.68 (Plaintiffs' Ex. 334.383); purchases from Neiman Marcus in the amount of $183,593.00 (Plaintiffs' Ex. 334.328); and a Mercedes Benz vehicle in the amount of $100,000.00 (Plaintiffs' Ex. 334.317).

| 4.  Other Assets Dude Owned Jointly with Shirley | | |
|---|---|---|
| **Asset** | **Portion Impressed with Constructive Trust for Plaintiffs' Benefit** | **Explanation and Tracing** |
| **a. Cash Dividends Shirley Received Since Dude's Death** | $538,686.50 | 45% of all dividends  paid on RJ Account 061 holdings ($1,197,081.13). Traced to RJ Account 061. (Doc. 188-2). |
| **b. Loan to Brian Pope** | $4,095,000.00, cash | This cash amount equals 45% of the total amount transferred from Dude and Shirley's joint accounts to Mr. Pope and his businesses, as a loan, prior to Dude's death. Shirley previously agreed that this amount shall be paid from cash or liquidated assets in Shirley's RJ account 061.  *See* Doc. 172-1, p. 2. |

| 5. Stocks Dude Owned Jointly with Shirley | | | | |
|---|---|---|---|---|
| **Stock Name** | **Ticker** | **No. of Shares Held in RJ Accts. 975 and 124 on the Date of Dude's Death [15]** | **Constructive Trust (45% of Shares Held at Dude's Death) [16]** | **Constructive Trust (45% of Stock Sale Proceeds) [17]** |
| Apple | AAPL | 715,184 | 321,832.8 | |

---

[15] The number of shares held in Accts. 975 and 124 on the date of Dude's death reflects converted shares. In some instances, the shares that Shirley retained were converted from one class to another at some point following Dude's death. Because the present-day holdings reflect that new class, the number of shares held at Dude's death—45% of which will be impressed with constructive trust for Plaintiffs' benefit—were adjusted to reflect the stock's value at that point in time in converted shares.

[16] Among those shares held in Accts. 975 and 124 at the time of Dude's death that Shirley retained possession of, Acct. 061 holds sufficient shares—with one exception—to accommodate the portion of stock impressed with constructive trust for Plaintiffs' benefit.

| 5. Stocks Dude Owned Jointly with Shirley | | | | |
|---|---|---|---|---|
| Stock Name | Ticker | No. of Shares Held in RJ Accts. 975 and 124 on the Date of Dude's Death [15] | Constructive Trust (45% of Shares Held at Dude's Death) [16] | Constructive Trust (45% of Stock Sale Proceeds) [17] |
| Alphabet, Inc., Class C | GOOG | 3,008 | 1,353.6 | |
| Alphabet, Inc., Class A | GOOGL | 3,000 | 1350 | |
| ConocoPhillips | COP | 4,676 | 2,104.2 | |
| Exxon Mobil Corporation | XOM | 5,000 | 2250 | |
| American Airlines Group | AAL | 208 | 93.6 | |
| Phillips 66 stock | PSX | 2,338 | 1,052.1 | |
| Invesco High Yield Municipal Fund, Class A | ACTHX (now ACTDX) | 248,655 | 111,894.75 | |
| Invesco Limited Term Municipal Income Fund, Class A | ATFAX (now ATFYX) | 66,149 | 11,468 [18] | |
| Black Rock Multi Asset Income Portfolio Fund, Class A | BAICX (now BIICX) | 36,073 | 162,32.85 | |
| Franklin High Yield Tax Free Income Fund, Class A | FRHIX (now FHYVX) | 20,928 | 9,417.6 | |

[17] Doc. 188-3 provides the total sale proceeds resulting from each stock held in Accts. 975 and 124 at the time of Dude's death that was subsequently sold.

[18] Shirley retained 11,468 shares of Invesco Limited Term Municipal Income Fund. This is insufficient to accommodate the number of shares to be distributed to Plaintiffs (29,767.05 shares). The 11,468 should be conveyed to Plaintiffs, and Shirley must substitute an asset held in RJ Account 061 that is equal in value to account for the 18,299.05 shares that would otherwise be transferred to Plaintiffs.

| 5. Stocks Dude Owned Jointly with Shirley | | | | |
|---|---|---|---|---|
| **Stock Name** | **Ticker** | **No. of Shares Held in RJ Accts. 975 and 124 on the Date of Dude's Death** [15] | **Constructive Trust (45% of Shares Held at Dude's Death)** [16] | **Constructive Trust (45% of Stock Sale Proceeds)** [17] |
| MFS Municipal Limited Maturity Fund, Class A | MTLFX | 28,080 | 12,636 | |
| MFS Arkansas Municipal Bond Fund, Class A | MFARX (now MARLX) | 146,293 | 65,831.85 | |
| MFS Municipal High Income Fund, Class I | MMHYX (now MMIIX) | 87,823 | 39,520.35 | |
| T. Rowe Price Media and Telecommunications Fund | PRMTX | 11,194 | 5037.3 | |
| Prudential Municipal High Income Fund, Class A | PRHAX (now PHIZX) | 76,309 | 34,339.05 | |
| Wells Fargo Strategic Municipal Bond Fund, Class A | VMPAX (now STRIX) | 67,920 | 30,564 | |
| SPDR Gold TR SHS | GLD | 2,000 | 900 | |
| Intel Corporation | INTC | 12,400 | | $ 239,658.25 |
| Procter and Gamble | PG | 3,120 | | $ 121,416.11 |
| Tesla Incorporated | TSLA | 3,500 | | $ 95,193.98 |
| J.P. Morgan Municipal Money Market Fund | JMAXX | 455,806.9 | | $ 200,035.71 |
| Invesco Charter Fund, Class A | CHTRX | 43,952 | | $ 373,011.21 |
| American Balanced Fund, Class A | ABALX | 22,874 | | $ 280,587.73 |

| 5. Stocks Dude Owned Jointly with Shirley | | | | |
|---|---|---|---|---|
| **Stock Name** | **Ticker** | **No. of Shares Held in RJ Accts. 975 and 124 on the Date of Dude's Death[15]** | **Constructive Trust (45% of Shares Held at Dude's Death)[16]** | **Constructive Trust (45% of Stock Sale Proceeds)[17]** |
| Artisan Mid Cap Value Fund, Investor Class | ARTQX | 21,193 | | $    237,886.14 |
| Black Rock Global Allocation Fund, Class A | MDLOX | 15,423 | | $    142,740.04 |
| Growth Fund of America, Class F1 | GFAFX | 8,154 | | $    185,248.08 |
| Hartford Mid Cap Fund, Class A | HFMCX | 22,453 | | $    340,206.15 |
| Highland Floating Rate Opportunities Fund, Class A | HFRAX | 33,328 | | $    164,074.37 |
| Perkins Mid Cap Value Fund, Class A | JDPAX | 58,817 | | $    477,451.51 |
| Lord Abbett Value Opportunities Fund, Class A | LVOAX | 36,470 | | $    352,949.25 |
| PIMCO Global Multi Asset Fund, Class A | PGMAX | 21,093 | | $    126,370.83 |
| Pioneer Classic Balanced Fund, Class A | AOBLX | 80,771 | | $    364,958.90 |
| Prudential Jennison Small Company Fund Inc., Class A | PGOAX | 64,697 | | $    880,316.40 |
| Ishares Silver Trust | SLV | 15,000 | | $    103,971.27 |
| Grand River Dam Authority Oklahoma Revenue Bonds, Series 2008 A (386442TE7) | | | | $     45,000.00 |

| 5. Stocks Dude Owned Jointly with Shirley | | | | |
|---|---|---|---|---|
| Stock Name | Ticker | No. of Shares Held in RJ Accts. 975 and 124 on the Date of Dude's Death.[15] | Constructive Trust (45% of Shares Held at Dude's Death).[16] | Constructive Trust (45% of Stock Sale Proceeds).[17] |
| ($100,000 par value) | | | | |

## V.  CONCLUSION

For the reasons explained above, the assets Dude owned individually, as set forth in Table 1, are subject to the Court's constructive trust for the Plaintiffs' benefit; however, since those assets are to pass through probate, Shirley is ordered to deliver them to the Administrator of Dude's estate for further disposition and transfer in the Circuit Court of Sebastian County, Arkansas.

The jointly held assets listed in Tables 2–5 are also subject to the constructive trust, but they will not pass through probate; accordingly, Shirley is ordered to convey and deliver Plaintiffs' share of those assets to Plaintiffs.

Because of the sheer number of assets, the holdings within accounts, and the complexity and detailed nature of the calculations set forth above, there is the distinct possibility that the Court could have made an inadvertent calculation or typographical error.  The Court will therefore withhold entry of judgment to allow the parties sufficient time to review the accounts and calculations and notify the Court if they believe any such inadvertent errors exist, and to explain the same in detail.  Any such notification should be emailed to the Court, with a copy to opposing counsel, by no later than close of

business on January 10, 2022.  Once the Court enters its final judgment, Shirley will have

thirty days to comply with this Order.

      **IT IS SO ORDERED** on this 21st day of December, 2021.

                       _____

                       TIMOTHY L. BROOKS
                       UNITED STATES DISTRICT JUDGE